**UNITED STATES of America**

**v.**

**Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi, and Ronald Betso, Defendants.**

**No. 87 Cr. 265 (CBM).**

United States District Court, S.D. New York.

June 27, 1988.

792

796

Rudolph W. Giuliani, U.S. Atty., New York City by Edward J.M. Little, Mary T. Shannon, Howard Wilson, Asst. U.S. Attys., S. Alexander Planzos, Sp. Asst. U.S. Atty., for U.S.

LaRossa, Mitchell & Ross, New York City by James M. LaRossa, for defendant Mario Biaggi.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Maurice N. Nessen, David Z. Seide, Cecelia Loving–Sloane, for defendant Stanley Simon.

Kevin P. McGovern, Brooklyn, N.Y., for defendant Peter Neglia.

Skadden, Arps, Slate, Meagher & Flom, New York City by Jeffrey Glekel, David H. Hennessy, for defendant John Mariotta.

Kostelanetz, Ritholz, Tigue & Fink, New York City by Peter J. Driscoll, Catherine L. Redlich, for defendant Bernard Ehrlich.

Dominick F. Amorosa, New York City, for defendant Richard Biaggi.

Buchwald & Kaufman, New York City by Alan R. Kaufman, for defendant Ronald Betso.

## OPINION

MOTLEY, District Judge.

### INTRODUCTION

This case brought under the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982 & Supp. IV 1987) came on for trial on March 11, 1988. On June 21, 1988, the Government rested its case and the defendants moved for judgments of acquittal under Fed.R.Crim.P. 29(a). The court denied all such motions with the exception of defendant Ronald Betso's motions for judgments of acquittal on Counts One, Two, and Forty–Nine of the Indictment, on which it reserved decision, and herewith denies, defendant John Mariotta's motion for judgment of acquittal on Count Thirty–Two, which it granted, and files the following opinion in explanation of its decision. The court notes that since resting its case the Government has withdrawn Counts Thirty–Nine, Forty–Five, and Forty–Six.

This court set out the facts alleged by the Government in the then-current indictments in *United States v. Biaggi*, 675 F.Supp. 790 (S.D.N.Y.1987) (omnibus opinion on pretrial motions), and *United States v. Biaggi*, 672 F.Supp. 112 (S.D.N.Y.1987) (denial of defendant Stanley Simon's severance motion), familiarity with which is assumed.[1]

In order to resist motions for a judgment of acquittal the Government must have introduced evidence "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt," *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984), as to each element of the count against a particular defendant that the court is considering. The court now sets out the Government's evidence developed at trial. After a discussion of the common elements of Count One, the substantive RICO count, this opinion proceeds to discuss each defendant in turn.

### COUNT ONE: GENERAL

 Count One of the Indictment charges the defendants with substantive RICO violations, alleging that they committed, in various combinations, nineteen acts of racketeering. Two elements of a substantive RICO offense apply generally to these defendants: the existence of an enterprise, as defined by the RICO statute, and the effect of that enterprise on interstate or foreign commerce. The court finds that the Government has introduced evidence sufficient to resist a motion for a judgment of acquittal as to both of these elements. The Wedtech Corporation, as a corporation, comes under the statutory definition of an "enterprise," and the Government introduced evidence that Wedtech participated in the Small Business Administration's (SBA) Section 8(a) program, through which it obtained contracts with the Department of Defense. The Government also introduced evidence that Wedtech competed for defense contracts with Section 8(a) companies operating in other states. This was sufficient evidence for a reasonable jury to find that Wedtech affected interstate commerce.

The remaining elements of Count One—association with the enterprise, engagement in a pattern of racketeering activity by the commission of at least two of the racketeering acts alleged in the indictment,

---

**1.** When the second *Biaggi* opinion was filed the case was to be tried on a second superseding indictment. *United States v. Biaggi*, 675 F.Supp. at 793. A fourth superseding indictment, on which the case was tried, was handed up on February 17, 1988. The differences are insignificant for purposes of this opinion.

and conduct or participation in the enterprise through the pattern of racketeering activity—require specific application to the individual defendants. When, as occurs frequently in this Indictment, a racketeering act is also charged against an individual defendant as a substantive count, the court shall discuss the evidence for the substantive count along with the racketeering act here in Count One, and not repeat the discussion later.

## MARIO BIAGGI—COUNT ONE: RICO

*Third Element: Association with the Enterprise*

■ The court finds that the Government has introduced sufficient evidence of Congressman Mario Biaggi's association with the Wedtech Corporation to resist a judgment of acquittal. There was considerable testimony that Congressman Biaggi assisted Wedtech in many ways. Senator Alphonse D'Amato testified that Congressman Biaggi had contacted him to help obtain contracts for Wedtech. There was other testimony that Congressman Biaggi contacted the late Congressman Joseph Addabbo on Wedtech matters, and helped to set up meetings between Wedtech officers and both Congressman Addabbo and Senator D'Amato. There was testimony that Congressman Biaggi helped persuade the Economic Development Administration (EDA) to accept the subordination arrangement with Bank Leumi that enabled Wedtech to arrange financing for the most lucrative defense contract it obtained, the so-called pontoon contract. The Congressman's help with EDA matters extended even to the relatively trivial example of permitting Messrs. Ehrlich and Moreno to use a helicopter in his name to deliver documents on a rush basis to the EDA in Philadelphia.

The testimony is that when Wedtech had difficulty meeting its deadline on the $500,-000 loan it allegedly obtained from Pat Simone, the Congressman was instrumental in negotiating an extension of the deadline. The Government has introduced evidence that the Congressman was also instrumental in Wedtech's efforts to secure the parking lot at One Loop Drive: that he was in touch with Susan Frank, that Harrison Goldin changed his position on One Loop after talking to Congressman Biaggi, that the Congressman expended considerable effort to placate Queens Borough President Donald Manes for the loss of jobs in Queens the One Loop package would entail, and that he put pressure on Bronx Borough President Simon to act as a strong advocate of the One Loop deal rather than a passive supporter. Further, the cooperator Mario Moreno testified that when he told the Congressman of Congressman Parren Mitchell's investigation of Wedtech, Congressman Biaggi replied that he and Congressman Mitchell were friends of long standing and that he would "see what he could do." Finally, Moreno also testified that in Wedtech's waning days Congressman Biaggi tried to arrange credit for Wedtech through his personal contacts with Teamsters President Jackie Presser, the limousine entrepreneur Bill Fugazy, and Chrysler Board Chairman Lee Iacocca.

The court finds that these efforts to help Wedtech, particularly in conjunction with other evidence to be recounted below, are sufficient to show Congressman Biaggi's association with the enterprise.

*Fourth and Fifth Elements: Pattern of Racketeering Activity/Conduct of Enterprise*

The court will now discuss the racketeering acts alleged against Congressman Biaggi in the indictment.

*Act 1(a)/Count Three: Extortion*

■ Racketeering Act 1(a), which is also Count Three, charges the Congressman with extortion of 5% of Wedtech stock for himself and his designees.

The Government has introduced sufficient evidence to sustain the first element of these charges—an attempt to receive property from another with their consent, induced by the wrongful use of fear or under color of official right. The testimony is that the Congressman first demanded Wedtech stock at a dinner in the summer of 1983, and that at that time he also

demanded a 5% commission on all contracts he could get for Wedtech. This latter demand was a direct solicitation of benefits in connection with the Congressman's official duties that satisfies the element of inducement under color of official right.

Moreover, in the meeting at Wedtech in July 1983 at which the Wedtech officers allegedly agreed to the Congressman's demands, the testimony is that he said words to the effect of "I can break this company as easily as I made it." This is clearly a threat from which a jury could conclude, if it believes the evidence, that Wedtech feared economic loss if it did not accede to the demand. Although the cooperator Fred Neuberger denies hearing the alleged threat, he admits he was only at the meeting for a few minutes. The court also notes that according to the cooperator Lawrence Shorten, in a different context, when Wedtech chose the law firm of Squadron Ellenoff Plesent & Lehrer (Squadron Ellenoff) instead of Shea & Gould for the public offering of Wedtech stock against Congressman Biaggi's urging, he also said "I can make or break this company."

As to the element of effect on interstate commerce, there was, as has been mentioned, testimony that Wedtech was in competition with Section 8(a) contractors from other states, so that if it had not gotten the contracts it did, one of those other companies would have.

Although extortion requires only that there be an attempt to receive property, there is evidence that Congressman Biaggi actually did receive property. First, the property received need not benefit the extorting party. Thus, the fact that the stock was issued, albeit in Bernard Ehrlich's and Richard Biaggi's names, is evidence sufficient to satisfy this element of the offense. Moreover, there is evidence that Congressman Biaggi actually owned the stock, in addition to the evidence recounted above that Congressman Biaggi induced the issuance of the stock for his own benefit. The testimony of Irwin Wolf about the Spring 1983 meeting attended by Wolf, the Congressman, Richard Biaggi, and others makes it clear that the purpose of that meeting was to determine how the stock should be issued for the Congressman. Wolf testified that various possibilities were discussed, each of which was determined to have tax or other disadvantages for the Congressman, until the Congressman, himself, concluded the meeting by saying that apparently the only way he could have an ownership interest in the stock without adverse consequences was to issue it in his son's name. Indeed, Wolf even testified that he thought Richard Biaggi was simply Congressman Biaggi's nominee. The cooperator Anthony Guariglia testified likewise.

Finally, the above provides sufficient evidence that the Congressman acted unlawfully, knowingly, and willfully, satisfying the final element of extortion. The motion for a judgment of acquittal on this count and act must therefore be denied.

### Act 1(b)/Count Four: Bribe Receiving

■ Racketeering Act 1(b) and Count Four charge the receipt of the stock as an act of bribe receiving.

The first element of the crime of bribe receiving is that the alleged recipient be a public official. It is undisputed that Congressman Biaggi was a public official, the United States Representative for the Nineteenth Congressional District of New York, during the entire period alleged in the indictment; thus this element is satisfied as a matter of law.

The second element is that the public official ask, demand, exact, solicit, seek, accept, receive, or agree to receive something of value for himself or another. The evidence of solicitation discussed in the extortion count applies here as well.

The same is true for the third element, that the public official's solicitation, etc. take place in return for being influenced in the performance of his official acts.

Finally, again as with the extortion count, all the evidence that tends to establish the other elements of bribe receiving is evidence that Congressman Biaggi acted with the requisite intent, which here is "knowingly, willfully, and corruptly."

### Act 1(c)/Count Five: Gratuity Receiving

■ Racketeering Act 1(c) and Count Five charge the receipt of the stock as the crime of gratuity receiving. Because this is a lesser included offense of bribe receiving, it follows that the Government has introduced sufficient evidence to resist a motion for a judgment of acquittal. The court notes, however, that there is an independent piece of evidence for this charge. At the meeting in which it was agreed to issue the stock, the Congressman is supposed to have argued that the stock should be issued because he and Ehrlich had done so much for Wedtech already—for example, Wedtech could not have gotten the small engine contract without them. This is evidence of a demand for something of value in exchange for a *past* official act, independently supporting the charge of gratuity receiving.

### Act 1(d)/Count Six: Mail Fraud

■ Racketeering Act 1(d) and Count Six charge the receipt of the stock as involving the crime of mail fraud.

The mailing specifically alleged in the indictment is one of Wedtech stock certificates from the law firm of Squadron Ellenoff to Richard Biaggi on or about October 28, 1983. The Government has introduced into evidence a cover letter for the certificates from Arthur Siskind of that firm to Richard Biaggi, which letter is countersigned by Richard Biaggi in acknowledgment of his receipt of the certificates. The court finds that this is sufficient evidence of the mailing, and that the mailing is itself sufficient evidence of the false or fraudulent representation, here that the stock belonged to Richard Biaggi, necessary for the crime of mail fraud.

The crime of mail fraud requires the existence of a fraudulent scheme to acquire money or property. The testimony of Irwin Wolf, mentioned above, provides evidence that there was such a scheme, and, moreover, that it was devised by Congressman Biaggi. This latter fact would suffice to establish the final element of mail fraud, namely that the Congressman willfully participated in the fraudulent scheme. There-fore, the Government has introduced sufficient evidence to avoid a judgment of acquittal on this count and act.

### Acts 2(a) and (b)/Counts Ten and Eleven: Extortion and Bribe Receiving

■ Act 2(a) and Count Ten charge Congressman Biaggi with the extortionate receipt of $50,000 from Wedtech in the guise of payment for legal services in the acquisition of the One Loop Drive property; Act 2(b) and Count Eleven charge receipt of the same $50,000 as bribe receiving.

The court discusses these counts together because the testimony of the three cooperating witnesses who were questioned about the $50,000 raises a problem common to both. Extortion and bribe receiving consist in receipt of property, due to fear, under color of official right, or upon an understanding that one's official acts will be influenced, in respect of promised or anticipated *future* action. If the thing of value is received for a past act, the offense is gratuity receiving, not extortion or bribe receiving. However, the cooperating witnesses who testified about the $50,000 payment—Moreno, Shorten, and Guariglia—agreed that it was offered and received *after* the law firm of Biaggi & Ehrlich (B & E) did the work it is supposed to have done on One Loop. Moreno's testimony, in sum, was that all the Wedtech officers agreed that B & E had done such a good job on One Loop that the firm deserved $50,000. Shorten confirms this testimony, saying that Moreno called the $50,000 a "bonus" merited by the fact that B & E's efforts went over their retainer, which at that point was $55,000 per year. Shorten also said that Guariglia told him the deal was worked out "right after" One Loop. Guariglia offered somewhat different yet consistent testimony. He said that the payment was John Mariotta's idea, that Mariotta had promised Congressman Biaggi and Ehrlich a "bonus" for their work, and that it was Guariglia's idea to bill it to services for One Loop rather than to the retainer, so that he could "capitalize it and amortize it over the term of the lease."

Thus, the cooperators' uniform testimony is that the $50,000 was intended as a gratu-

ity for services rendered. Even Guariglia's decision to bill it to One Loop instead of the retainer is consistent with this.

Nevertheless, the court finds that the Government has introduced evidence sufficient to send these acts and counts to the jury. First, there was testimony that at the time of the $50,000 payment Wedtech was current on its retainer to B & E. Second, inasmuch as the principal work on One Loop done by B & E before it sent Wedtech the bill for the $50,000 was the single day of frenetic activity by Bernard Ehrlich and Carlos Cuevas, Jr., June 4, 1984, that resulted in Susan Frank's June 5 letter of intent, a reasonable jury could conclude that the firm could not possibly have done $50,000 worth of legal work on One Loop. Finally, and most importantly, the documentary evidence is consistent with the Government's theories of extortion and bribery. Biaggi & Ehrlich sent Wedtech an invoice dated June 19, 1984, after the letter of intent and indeed after the June 14 meeting of the Board of Estimate at which the One Loop matter was first supposed to be calendared; Wedtech paid with a check dated July 13, 1984, the day after the Board of Estimate meeting at which One Loop was in fact approved. A reasonable jury, disbelieving the cooperators' testimony that the payment was a bonus, could conclude that the invoice was a solicitation of money for future services. The fact that the bill was paid the day after the crucial Board of Estimate meeting is circumstantial evidence of this theory. Insofar as the theory applies to Congressman Biaggi, it supplies the elements of inducement under color of official right for extortion, and solicitation of something of value in exchange for influence in his performance of official acts, such as contacting New York city officials in connection with the One Loop matter. A most important piece of circumstantial evidence for applying this theory to Congressman Biaggi is Mario Moreno's testimony that the Congressman remarked that $50,000 was very little for the work he had done on One Loop, particularly in dealing with Donald Manes. Combined with the dates of the invoice and the check, this remark would permit a reasonable jury to infer that Congressman Biaggi caused the issuance of the invoice, a solicitation for payment for future services such as the exercise of persuasion on the late Queens Borough President to vote for Wedtech at the Board of Estimate meeting. The fact that the check is dated the day after the Board of Estimate meeting is powerful circumstantial evidence, in that it permits a reasonable jury to infer that the check was a payment for the successful exercise of influence on Board of Estimate members. (The evidence is that the Congressman spoke to Board of Estimate members Simon, Goldin, and Manes.) At the same time the jury could infer, as the Government would have it, that the theory that the $50,000 was a bonus for B & E's work, in particular in arranging the events of June 4, is a sham.

As discussed in connection with Racketeering Act 1, the element of effect on interstate commerce is present in that, had Wedtech lost One Loop it would have lost the pontoon contract, and some other Section 8(a) company in another state would have gotten it.

Finally, all the evidence for the other elements of extortion and bribery is also evidence for the requisite intent.

### Act 2(c)/Count Twelve: Mail Fraud

Racketeering Act 2(c) and Count Twelve charge Congressman Biaggi with mail fraud in connection with the $50,000 payment. The mailings alleged in the indictment are the B & E invoice, dated June 19, 1984, and the Wedtech check, dated July 13, 1984. Both were introduced into evidence by the Government.

The indictment alleges a fraud on Wedtech. From the evidence mentioned above, that Wedtech owed nothing on its retainer to B & E and could not have incurred $50,000 in legal services with respect to One Loop by the time of the invoice, a reasonable jury could conclude that the invoice's representation that Wedtech owed the firm $50,000 was false. A false invoice is by its very nature part of a scheme to obtain money or property under false pretenses. Thus, a reasonable jury could con-

clude that the fraudulent scheme requirement of a mail fraud charge is satisfied. Finally, there is evidence, such as the remark about his dealings with Borough President Manes mentioned above, from which a reasonable jury could conclude that Congressman Biaggi knowingly and willfully participated in this fraudulent scheme, either as its originator, a common schemer, or an aider and abettor.

*Act 6/Count Thirteen: Mail Fraud*

█ Racketeering Act 6 and Count Thirteen charge Congressman Biaggi with mail fraud in connection with the sham stock purchase agreements.

The specific mailings mentioned in the indictment are the stock purchase agreements themselves and correspondence relating to those agreements between the New York and Washington, D.C. offices of the SBA. The stock purchase agreements and correspondence were introduced into evidence.

There was considerable, consistent testimony about the nature and object of the fraudulent scheme alleged in this act and count. As set out by Mario Moreno, the scheme involved the execution of stock purchase agreements under which John Mariotta would buy enough stock from Richard Biaggi, Bernard Ehrlich, and the cooperators so as to appear to control more than 50% of the company, so that Wedtech would not lose its Section 8(a) certification. The false representation to the SBA inherent in the scheme was that Wedtech met the certification requirements for a Section 8(a) company when in fact it did not, so that it could continue, illegitimately, to reap the benefits of the Section 8(a) program.

The evidence regarding Congressman Biaggi's participation is that he entered after the scheme originated. There was testimony that at a meeting at B & E, the proposal for a stock purchase agreement was brought to Congressman Biaggi. According to that testimony, he approved of the general idea, but insisted that because he had helped Wedtech out of trouble so often in the past, he be given certain concessions, such as a one-year payout. At least two

pieces of circumstantial evidence support the claim that Congressman Biaggi participated in the scheme. First, the Richard Biaggi/Bernard Ehrlich stock transfer agreements differ from the cooperators', in that they embody the conditions Congressman Biaggi is said to have demanded, or ones like them. Second, it is noteworthy that Ehrlich and Richard Biaggi never complied with the escrow agreement under which the stock certificates were to be held at Squadron Ellenoff, and that the testimony is that it was *Congressman* Biaggi who summed up the situation by saying "My safe is as good as Squadron Ellenoff's." This tends to confirm the sham character of the transaction, as well as Congressman Biaggi's participation.

It should also be noted that Mario Moreno testified that Congressman Biaggi didn't really care about getting paid for the stock—he really wanted it back.

*Act 19/Count Eighteen: Obstruction of Justice/Perjury*

Racketeering Act 19 charges Congressman Biaggi with obstruction of justice by giving false answers to questions put to him in a deposition taken in connection with federal grand jury proceedings relating to Wedtech. Count Eighteen charges Congressman Biaggi with perjury in having given those false answers.

*Perjury*

█ The Government has read the allegedly perjurious deposition testimony into the record, providing evidence sufficient to defeat a motion for judgment of acquittal on the elements (1) that the testimony was given under oath and (2) that it concerned matters material to the grand jury inquiry. The question Congressman Biaggi allegedly answered falsely was whether, apart from certain letters, he had contacted government officials about Wedtech. The Government has introduced sufficient evidence of the Congressman's contacts with other government officials about Wedtech to put before the jury the remaining elements of the crime of perjury— whether the testimony was false and whether it was willfully given, in that the Congressman knew it to be false.

*Obstruction of Justice*

■ ] As for the racketeering act of obstruction of justice, the testimony's being read into the record is sufficient evidence on the elements of (1) the empaneling of a grand jury conducting an investigation into violations of federal law and (2) the Congressman's knowledge of the grand jury. The evidence that Congressman Biaggi gave willfully false testimony before the grand jury is evidence that he endeavored corruptly to obstruct or impede the grand jury, the final element of an obstruction of justice charge.

### MARIO BIAGGI—COUNT TWO: RICO CONSPIRACY

■ Count Two charges all defendants with violation of 18 U.S.C. § 1962(d), that is, with RICO conspiracy, specifically conspiracy to violate 18 U.S.C. § 1962(c) by committing the crimes charged in Count One.

The evidence for an agreement on Congressman Biaggi's part to violate § 1962(c) is the evidence that he committed at least two of the four racketeering acts with which he is charged. In a separate opinion, this court has made the finding, required by *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969) *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), that there is a fair preponderance of evidence admissible independently of the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), that Congressman Biaggi was a member of the conspiracy charged. In view of that *Geaney* finding, evidence admissible only under Rule 801(d)(2)(E) comes in against Congressman Biaggi, and this court finds that evidence sufficient to deny a motion for judgment of acquittal of the charges that

1. There was an agreement between Congressman Biaggi and at least Moreno, Neuberger, and Mariotta to receive 5% of Wedtech stock, in the names of Richard Biaggi and Bernard Ehrlich;

2. There was an agreement between Congressman Biaggi and at least Moreno, Neuberger, Mariotta, and Guariglia to receive $50,000, payable to Biaggi & Ehrlich;

3. There was an agreement between Congressman Biaggi and at least Richard Biaggi, Ehrlich, Moreno, Guariglia, Shorten, and Neuberger to defraud the Department of Defense by means of the fraudulent stock purchase agreement.

### MARIO BIAGGI—COUNTS SEVEN THROUGH NINE: FALSE STATEMENTS

■ Counts Seven through Nine charge Congressman Biaggi with making false statements on the financial disclosure forms he is required to file by the Ethics in Government Act (EIGA). Specifically, Count Seven charges Congressman Biaggi with omitting his acquisition and ownership of 112,500 shares of Wedtech stock from sections III ("Holdings") and V ("Transactions") of his 1983 EIGA disclosure form. Count Eight charges him with omitting his ownership of 112,500 shares of Wedtech stock from section III ("Holdings") of his 1984 EIGA disclosure form; and Count Nine charges him with omitting his ownership of 106,250 shares of Wedtech stock from section III ("Holdings") and omitting the income derived from the sale of 25,000 shares of Wedtech stock from sections II. B ("Unearned Income") and V ("Transactions") of his 1985 EIGA disclosure form.

The Government has introduced sufficient evidence as to each element of these counts, which may be discussed together. The EIGA disclosure forms are in evidence. The alleged false representations were made in a document filed with the Clerk of the House of Representatives and, therefore, fall as a matter of law within the jurisdiction of a department or agency of the United States. The alleged false representations involve Congressman Biaggi's failure to disclose that he was the true owner of the Wedtech stock issued in his son's name. The evidence introduced by the Government for this claim has been assessed and found sufficient in the discussion of earlier counts and acts. Finally, that evidence is also evidence for the Con-

gressman's failure to disclose being unlawful, willful, and knowing.

## MARIO BIAGGI—COUNT FOURTEEN: PERJURED INCOME TAX RETURN

■ Count Fourteen charges Congressman Biaggi with filing a false personal income tax return for 1983. The return is in evidence, and appears to have been signed by Congressman Biaggi. It contains a declaration that it is made under the penalties of perjury.

The Government has introduced sufficient evidence that Congressman Biaggi did not believe this tax return to be true and correct.

First, given that, as this court has already found, the Government has introduced sufficient evidence that Congressman Biaggi was the real owner of the Wedtech stock, there is sufficient evidence to conclude that he knew the return not to be true and correct, in that he failed to report his acquisition of the stock.

Second, the Government introduced evidence sufficient at least to raise questions about the proper tax treatment of Congressman Biaggi's 1983 transactions in Florida real property. These transactions were described most fully in the testimony of Irwin Wolf. Wolf explained how Congressman Biaggi and Bernard Ehrlich handled the Florida condominium transaction. His testimony was that the purchase was financed with a combination of B & E funds and a mortgage, each representing half the expense. Ehrlich paid the mortgage from his B & E draw account. The B & E funds used to buy the property were also charged to Ehrlich's account. Ehrlich then, however, drew checks on his personal account payable to Congressman Biaggi, up to half the amount of the B & E funds. In essence, Congressman Biaggi thus got a half interest in the condominium without paying taxes on it. This would have been impossible, Wolf testified, had that interest been conveyed through B & E rather than through Ehrlich's personal checks; under EIGA, income from B & E would be construed as buyout payments, which are taxable. Evan Bell testified that he concluded

the transaction generated no taxable income for Congressman Biaggi. Wolf agreed, taking the view that Ehrlich took upon himself the whole tax burden of a property in which he had only a half interest.

On cross-examination, however, Wolf seemed to admit that this meant that Congressman Biaggi should have reported the transaction on his EIGA disclosure form, either as income or a gift—and there was no testimony that benefits that count as income or gifts for EIGA purposes need not do so for purposes of one's personal federal income tax return.

Essentially the same questions arise about the so-called Lutz property. This was bought before Congressman Biaggi was bought out of B & E. There was testimony that Ehrlich wanted to give him half the proceeds, but was told he could not do so straightforwardly, under the buyout agreement. So Ehrlich's wife wrote Congressman Biaggi a check for half the amount, even though Ehrlich paid the whole tax on the proceeds. Irwin Wolf maintains this transaction was handled correctly for tax purposes.

Finally, the evidence that the return is subscribed under penalties of perjury combined with the evidence that Congressman Biaggi was aware of the return's falsity provide evidence that he acted knowingly and willfully.

## STANLEY SIMON—COUNT ONE: RICO

*Third Element: Association with the Enterprise*

■ As to the defendant Stanley Simon's association with the enterprise, the court finds that the Government has introduced sufficient evidence to defeat a motion for judgment of acquittal. In particular, the evidence that Simon assisted Wedtech in its effort to lease the parking lot at One Loop Drive and the evidence that in exchange for that service Wedtech disbursed some $50,000 at his behest from the FHJ account could reasonably lead a jury

to find association beyond a reasonable doubt.

*Fourth and Fifth Elements: Pattern of Racketeering Activity/Conduct of the Enterprise*

*Act 3/Count Twenty: Extortion*

 Racketeering Act 3 and Count Twenty charge Simon with extorting a job and salary raises from Wedtech for his brother-in-law, Henry Bittman.

There is evidence of receipt of property in Henry Bittman's personnel folder, introduced into evidence by the Government, which sets forth his salary schedule and raises. Although this is itself sufficient to satisfy this element of the crime of extortion, the court notes that there is also some evidence that Stanley Simon received property directly. Alfred Rivera testified that Anthony Guariglia explained to him that Bittman's raises were "the way we have of getting money to Stanley Simon," although Rivera did not believe that Bittman was a person who would engage in kickbacks and so did not interpret this remark literally.

There is sufficient evidence that Simon induced this receipt of property both under color of official right and through fear. Mario Moreno's testimony was that Simon solicited a Wedtech job for Bittman, first through Bernard Ehrlich, then directly. Though there is no testimony that Simon represented that he would help or hurt Wedtech at this time, Moreno did testify that he agreed to hire Bittman, over strong opposition from Fred Neuberger and John Mariotta, "to keep Stanley Simon happy." As for extortion through fear, there was testimony that Bittman was at the top of every layoff list at Wedtech, and that he only kept his job because of Mario Moreno's fear of Simon. For example, Alfred Rivera related that Anthony Guariglia told him that Moreno would never approve laying off Bittman; and Lawrence Shorten confirmed that Moreno consistently argued that Bittman should be kept on in order to keep Simon happy. The importance of keeping Simon happy, according to this testimony, was that an unhappy Simon could

bring enough inspectors down on Wedtech to close down the operation.

In one specific instance, Moreno testified that after Bittman had gotten a raise of $2000 in November 1983, Simon said that he, Simon, was "unhappy" with that amount; Moreno took this as a threat, and Bittman shortly got another $3000.

There was evidence that Bittman's employment had two effects on interstate commerce.

First, the uniform testimony was that Bittman was not doing work worth what Wedtech was paying him. In particular, Alfred Rivera and Harry Tavitian, who supervised Bittman at different times, gave detailed accounts of his inadequate performance. They also compared his salary, responsibilities, and performance to other Wedtech employees; in sum, they testified that he was paid more than all but the best qualified, and had responsibilities at the level of the least qualified.

Second, Rivera testified to Bittman's destruction of time cards after a DCAA auditor had asked to see them, these time cards being a part of the progress payment fraud first explained by Mario Moreno.

The court notes that this uniform testimony that Bittman was performing inadequately is evidence that the job and raises were not benefits "owing to Simon's office," as is required for extortion. That is, the testimony tends to negate the defense that Simon, in the course of his official business, evaluated Bittman as a qualified worker who deserved a job, and that Wedtech acted on his recommendation.

Finally, the above evidence is also evidence that Simon acted with the requisite intent for extortion—unlawfully, knowingly, and willfully. If the evidence introduced by the Government is believed, Simon can scarcely be supposed to have been acting by mistake, accident, or negligence.

*Acts 4(a) and (b)/Count Nineteen: Extortion/Bribe Receiving*

Act 4(a) and Count Nineteen charge Simon with the receipt of $50,000 from Wedtech through extortion; Act 4(b) charges

the alleged receipt of $50,000 as bribe receiving under New York law.

*Extortion*

There was evidence that Simon induced the receipt of property both through fear of economic loss and under color of official right.

Mario Moreno, Ceil Lewis, Lawrence Shorten, and Fred Neuberger all testified that Simon solicited $50,000—originally $100,000, according to some testimony—from Neuberger at a benefit for the Hebrew Home for the Aged at Yonkers Raceway. Chris Gaylord, then in charge of bookings at Yonkers Raceway, offered evidence that the benefit took place on June 20, 1984. This would have been in the midst of Wedtech's efforts to obtain the parking lot at One Loop Drive—after Susan Frank's June 5 letter of intent to grant Wedtech the variance it needed, but before the July 12 Board of Estimate meeting at which the variance was approved. There was evidence from Fred Neuberger that the agreement to give Simon $50,000 was a *quid pro quo* for future efforts to help Wedtech obtain One Loop. Neuberger's testimony, both before the grand jury and on direct, was that he had first asked Susan Frank, who was at the Yonkers Raceway benefit, how the One Loop effort was going, and that Simon pulled him aside and said "Don't ask her about it, myself or my office will take care of it." Asked point-blank, Neuberger said he agreed to give the $50,000 because they needed Simon's help on One Loop, and "who knows what ... other—shall we say favors." Although on cross-examination Neuberger said that Simon did not threaten him or Wedtech, this direct solicitation meets the criteria for extortion under color of official right.

There was extensive testimony that Simon helped Wedtech with One Loop at two different times. Before the meeting at Yonkers, on June 4, he helped arrange the meeting that resulted in Susan Frank's June 5 letter of intent. After Yonkers, he was a strong advocate of Wedtech at the July 14 meeting at which the Board of Estimate approved the One Loop lease.

Moreover, there was testimony by Mario Moreno and Carlos Cuevas, Jr. that Simon helped or promised to help Wedtech after the solicitation, in other ways, as with its attempt in late 1984/early 1985 to acquire a building at Brown Place.

However, even if there had been no testimony that Simon helped or promised to help Wedtech in any way after the solicitation, under the Second Circuit's decision in *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc) Simon's "continued acceptances of unwarranted benefits served to communicate a message inducing such benefits and, thus, constituted extortionate misuse of the power of public office." *O'Grady*, 742 F.2d at 694 (Pierce, J., concurring).

There was, moreover, evidence that Wedtech acted out of fear of economic loss. Although there is no specific allegation that Simon threatened Wedtech with regard to the $50,000, Anthony Guariglia testified that when he asked Mario Moreno why Wedtech was giving Simon $50,000, Moreno replied, "It's not what he can do to help us, it's what he can do to hurt us."

There was evidence from three different sources that Simon received money or property from Wedtech.

First, Ceil Lewis testified to disbursements, direct and indirect, from the FHJ account to Simon, and the relevant checks were introduced through her. Anthony Guariglia also testified as to four FHJ checks.

Second, Mario Moreno testified to giving Simon cash and chips for gambling, and allowing him to use his comps, on trips to Atlantic City.

Third, various restaurant personnel, caterers, etc., testified that Simon or organizations related to him, such as the Riverdale Democratic Club, incurred expenses paid for with what Ceil Lewis testified were FHJ funds, and what were not, in any case, checks drawn on Simon's account.

There was evidence that Simon's alleged activities had an effect on interstate commerce. If nothing else, there was testimony that Simon traveled from New York to

New Jersey to gamble with money allegedly extorted from Wedtech.

Finally, the above evidence is sufficient to deny a motion for judgment of acquittal on the issue of willfulness. As before, the evidence is evidence that Simon acted unlawfully, knowingly, and willfully, not out of negligence or mistake.

### Bribe Receiving

 As to Racketeering Act 4(b), charging Simon with bribe receiving under New York law, New York Penal Law § 200.10 requires first of all that the alleged recipient be a public official. As Bronx Borough President at the times relevant to the indictment, Simon was a public official as a matter of law. Second, the alleged recipient must solicit, accept, or agree to accept some benefit. All the evidence about Simon's solicitation of Neuberger satisfies the requirements of New York law as well as it does the federal law "color of official right" requirement. Third, New York law requires an "agreement or understanding that [the public official's] vote, opinion, judgment, action, decision, or exercise of discretion as a public servant will ... be affected." The testimony that Simon promised to help Wedtech after the solicitation, both by taking care of One Loop and in other projects, provides sufficient evidence of such an agreement or understanding.

### Act 16/Count Twenty–Two: Obstruction of Justice/Perjury

 Racketeering Act 16 charges Simon with obstruction of justice by giving false testimony before a grand jury investigating alleged corruption in the Bronx. Count Twenty–Two charges Simon with perjury by giving the same false testimony.

### Perjury

The Government read the allegedly perjurious grand jury testimony into the record. Thus, this court reaches the same results it did with the counterpart charges against Congressman Biaggi. The reading provides sufficient evidence that the testimony was given under oath and that it concerned matters material to the grand jury inquiry. The question Simon is alleged to have answered falsely was, in substance, whether he received, solicited, or was offered things of value in connection with his duties as an elected or appointed official. The Government has introduced sufficient evidence, as set forth in this court's discussion of the extortion and bribe receiving charges, to resist a motion for judgment of acquittal. That evidence is also evidence for willfulness, in that a jury could not reasonably suppose, if it found that Simon answered falsely, that he did so without knowing that his answer was false.

### Obstruction of Justice

As with Congressman Biaggi, the Government's reading the allegedly perjurious testimony into the record provides sufficient evidence of the grand jury's empanelment and of Simon's knowledge of the grand jury's existence. And again as with Congressman Biaggi, the evidence that Simon answered falsely is evidence that he corruptly endeavored to obstruct or impede the grand jury.

### STANLEY SIMON—COUNT TWO: RICO CONSPIRACY

 Like Congressman Biaggi, Simon is charged with RICO conspiracy under § 1962(d). The evidence for such a violation—that is, for an agreement on Simon's part to violate § 1962(c)—is the evidence that he committed at least two of the three racketeering acts with which he is charged. This court has made a separate *Geaney* finding that there is a fair preponderance of evidence independent of coconspirator statements that Simon was a member of the charged RICO conspiracy. In view of the consequent admissibility of coconspirator statements under Rule 801(d)(2)(E), there is evidence sufficient to deny a motion for judgment of acquittal that

1. There was an agreement between Simon and Neuberger to give Simon $50,000 in Wedtech funds;

2. There was an agreement between Simon and Moreno to give Bittman a job and raises at Wedtech.

## STANLEY SIMON—COUNT TWENTY-ONE: EXTORTION OF RALPH LAWRENCE

■ Count Twenty–One charges that between 1983 and 1987 Stanley Simon extorted some $14,000 from his self-styled right-hand man, Ralph Lawrence. Sufficient evidence was introduced to deny a motion for judgment of acquittal as to this count.

First, Ralph Lawrence testified that Simon offered him an increase in salary on the condition that he give half the increase to Simon in the form of cash and other benefits. A clearer example of inducement under color of official right could scarcely be offered. Moreover, Lawrence testified to fear of economic loss: he characterized Simon's action as "an offer he couldn't refuse"—because if he had refused, he thought, he would have been demoted or fired.

Lawrence estimated that he kicked back a total of $13,000–$15,000 to Simon. His personnel folder, showing his raises, was introduced into evidence. He testified to an extraordinary variety of benefits he provided for Simon—picking up restaurant bills, establishing restaurant tabs, obtaining theater tickets, giving Simon gambling chips and money, renting cars, paying gardening and cable TV bills, etc. Lawrence also testified that Simon retained both petty cash from Sabino Fogliano and political contributions for his personal use, and that Lawrence, himself, gave Simon petty cash. In support of Lawrence's testimony, the Government introduced Lawrence's American Express slips, Diners Club slips, Visa slips, Citicard receipts, and Avis car rental contracts, all allegedly to the benefit of Simon, as well as checks drawn by Lawrence allegedly to pay Simon's gardening, cable TV, and restaurant bills. Maria Bulfamente, the wife of Simon's gardener Mario Bulfamente, was later brought on to corroborate that Lawrence had given her the check introduced into evidence.

As with the other extortion counts, the allegation that Simon extorted cash and chips for gambling outside New York State assures an effect on interstate commerce.

Lawrence also testified that he picked up some of Simon's expenses during their trip to the 1984 Democratic National Convention in San Francisco. In this case there is an effect on foreign commerce as well, in view of Lawrence's accompanying Simon on trips to Italy and Israel.

Similarly, as with the other extortion counts, evidence on the other elements is also evidence that the alleged extortionist, here Simon, acted with the required intent —unlawfully, knowingly, and willfully.

## STANLEY SIMON—COUNT TWENTY-THREE: INCOME TAX EVASION

■ Count Twenty–Three charges Simon with income tax evasion for the year 1985. On his 1985 tax return, introduced into evidence, Simon reported an income of $101,428 with $11,218 declared due and owing in taxes.

The return is signed, and the presumption that Simon knew of its contents is therefore operative. This court will, however, evaluate the evidence for Simon's knowledge independently of that presumption.

The crime of income tax evasion requires, first of all, that the defendant owe substantially more tax than was declared due on his return as originally filed. The return was introduced through Simon's accountant, I. William Stone, who testified that Simon never told him that he, Simon, had received $10,000 in cash from Wedtech, cash from Ralph Lawrence, expenses paid by Lawrence, or services from Sabino Fogliano. Yet evidence was introduced that Simon indeed received all of these benefits. Ceil Lewis testified to the $10,000 cash; Ralph Lawrence testified to picking up an envelope from Ceil Lewis that matched her description of the envelope she claimed held the $10,000 (although Lawrence testified he didn't know what was in the envelope); Lawrence also testified to picking up tabs for Simon in 1985; and Sabino Fogliano testified to tiling Simon's house in that year. All these benefits could constitute taxable income, and if they do this requirement is satisfied.

The second element of the crime of tax evasion is that the taxpayer know that he owes substantially more tax than he declared due. The evidence that Simon received benefits is necessarily evidence that he knew he received them. Thus, the only question here is whether he believed that they were taxable income, as opposed to gifts, loans, or the like. There is sufficient evidence on this question to deny a motion for judgment of acquittal. The evidence is that the Wedtech benefits were part of the $50,000, so they do not fit into any of these categories. Ralph Lawrence was adamant that he gave Simon benefits because he thought it was his job to do so, so his contributions do not fit into these categories. Finally, Sabino Fogliano did not testify that his work for Simon was a gift or anything of the kind, and his testimony about the general course of his transactions with Simon allows the inference that they were closer to bribery or extortion.

The third element of the crime of income tax evasion is that the taxpayer file a return reflecting a substantially lower income than he actually earned, with the intent to defraud the Government of taxes owed. The evidence that Simon knew he received more taxable income than he reported is necessarily evidence that he acted willfully in failing to report it. If he knew it was taxable, he knew that he should have reported it. Thus, because there is enough evidence to bring the second element, that of Simon's knowledge, before the jury, there is enough for willfulness, and this count cannot be dismissed.

## PETER NEGLIA—COUNT ONE: RICO

In Count One, Peter Neglia is charged with unlawfully, willfully, and knowingly conducting or participating in the conduct of Wedtech through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and (5). The first two of the five elements of this RICO charge have already been discussed. The last three elements are discussed below.

*Third Element: Association with the Enterprise*

■ Government witnesses testified that Peter Neglia served as SBA Regional Administrator for the New York area and then as Acting Chief of Staff for the SBA in Washington, D.C. during the time that Wedtech was certified in the 8(a) program and was in regular communication with the SBA. Several witnesses also testified that Peter Neglia was Wedtech's guest at social and political events and the 1985 presidential inaugural festivities. This evidence is sufficient for a jury to find that the Government has demonstrated association with the enterprise beyond a reasonable doubt.

*Fourth Element: Engaging in a Pattern of Racketeering Activity by Committing, or Aiding and Abetting the Commission of, At Least Two Acts of Racketeering Activity*

*Act 6/Count Thirteen: Mail Fraud*

■ Racketeering Act 6 and Count Thirteen charge Peter Neglia with mail fraud committed through the submission of sham Stock Purchase Agreements (SPAs) that misrepresented the extent of John Mariotta's ownership of Wedtech. On the basis of the following evidence, the jury could find that this charge has been proved beyond a reasonable doubt; in conjunction with evidence proving that at least one other defendant actually committed this act of mail fraud, this evidence would allow the jury to find that a charge of aiding and abetting has been proved against Peter Neglia beyond a reasonable doubt.

Mario Moreno testified about a meeting during which Peter Neglia agreed to discuss with SBA attorneys and officials the various alternatives Wedtech devised as ways to be recertified under the 8(a) program after Wedtech's public offering placed it in technical default. Government witnesses testified that Bernard Ehrlich bounced Wedtech's ideas regarding ways to be recertified for 8(a) off Peter Neglia, and that Bernard Ehrlich brought from Peter Neglia an early draft of a SPA with marginal comments as to default provisions that the SBA would regard as suspect. One witness testified that, regarding the side agreement among the parties to the

SPAs that John Mariotta would default, Bernard Ehrlich told him that Peter Neglia said he "didn't care what the agreement was 'between us girls' as long as it stood up with the SBA." Mario Moreno also testified to a meeting after the SPAs had been executed in which Peter Neglia asked Bernard Ehrlich how he could trust John Mariotta in transferring his stock given John Mariotta's earlier behavior. Anthony Guariglia testified that Peter Neglia asked Anthony Guariglia to explain the SPA to Ed Rose, another SBA official, and that Anthony Guariglia did not tell Rose or any other SBA official about John Mariotta's agreement to default. There is testimony that Peter Neglia warned Bernard Ehrlich about legal issues he should be prepared to address in light of the submission of the SPAs. Bernard Ehrlich also showed Anthony Guariglia *original internal* SBA memoranda discussing the SPA, which Bernard Ehrlich had obtained from Peter Neglia.

The foregoing evidence is sufficient to prove beyond a reasonable doubt that Peter Neglia directly committed, or aided and abetted the commission of, mail fraud as charged in this count. Peter Neglia's motion for a directed verdict as to Count Thirteen is therefore denied.

*Act 8(a)/Count Twenty–Four: Bribe Receiving*

■ Racketeering Act 8(a) and Count Twenty–Four charge Peter Neglia with accepting a $4,500 bribe from Wedtech. The elements of bribe receiving as applied to the evidence admitted in this case are discussed below.

*First Element: Demand, Receipt, etc. of Something of Value for Self or Another*

Several witnesses testified that Peter Neglia attended the 1985 inaugural events —staying at the Sheraton and using limos —at Wedtech's expense. They also testified that he attended lunches and dinners as Wedtech's guest.

Mario Moreno testified that GX313A, a $2,000 check dated June 8, 1984, was given to Bernard Ehrlich to be delivered to Joseph Neglia to cover memberships in the Inner Circle for Mario Moreno and Peter Neglia. GX313B, C, D, E, F, G, I, J are also checks on Mario Moreno's checking account given at Joseph Neglia's request as political contributions.

A government witness testified that she received two $1,000 Banco Popular bank checks from Wedtech in payment for Empire Club 1984 memberships for Peter Neglia and Joseph Neglia. Copies (GX317J–3, 317J–4) and originals of the checks (GX720Y–1) are in evidence. Another witness testified that the bank checks were purchased with an F.H.J. check (GX720Y), which is also in evidence. GX317E shows deposits credited to Peter Neglia and Joseph Neglia and GX317E–1 shows that Peter Neglia, Joseph Neglia, Mario Moreno, and Bernard Ehrlich were scheduled to sit together at the 1984 dinner-dance funded by the contributions.

There was also testimony that Anthony Guariglia paid $2,500 for tickets to a dinner-dance conducted by the Empire Club in 1985. The checks were admitted in evidence, as was a letter from Joseph Neglia directing that the money, in conjunction with a $500 check from B & E, be applied to Peter Neglia, Joseph Neglia, and Mario Moreno. (GX 317A, 317A–1, 317A–3.) Likewise government exhibits 317F, 317F–1, and 317G, listing deposits, dinner-dance ticket numbers, and seating arrangements for the event, are evidence that the checks were deposited and credited to dinner-dance tickets for Peter Neglia, his father, and friends.

*Second Element: Defendant was a Public Official at the Time*

There was testimony that Peter Neglia was SBA Regional Administrator until late 1984 and that he was Acting Chief of Staff at the SBA in D.C. in 1985 when the items of value were received. This is sufficient evidence for the jury to find proof of this element beyond a reasonable doubt.

*Third Element: Defendant Accepted the Items in Return for Being Influenced in the Performance of his Official Duties*

The jury could find proof beyond a reasonable doubt of this element by consider-

ing testimony about the timing of the payments, Peter Neglia's increasingly important position in the SBA, and the fact that Wedtech continued to seek new 8(a) contracts and options to extend existing 8(a) contracts during this period.

*Fourth Element: Knowing, Willful, Corrupt Act*

The jury could find proof beyond a reasonable doubt of this element by considering testimony regarding Peter Neglia's practice of attending dinners and political events at Wedtech's expense, the relationship between Peter Neglia and Joseph Neglia, the fact that Peter Neglia knew that he did not himself pay for his meals, the inaugural festivities, memberships in the political groups or the tickets to the dinner-dances, and the fact that he actually sat or was scheduled to sit with Wedtech officers at the events for which they paid.

Peter Neglia's motion for a judgment of acquittal as to Count Twenty–Four is denied.

*Act 8(b)/Count Twenty–Five: Gratuity Receiving*

█ Racketeering Act 8(b) and Count Twenty–Five charge Peter Neglia with receiving a $3,000 gratuity from Wedtech.

The evidence that may show beyond a reasonable doubt that Peter Neglia knowingly received something of value while he was a public official has previously been discussed. The jury could find beyond a reasonable doubt that the items of value were received because of Peter Neglia's official acts from testimony regarding Wedtech's practice of "compensating" political friends, the timing of the payments, and evidence of Peter Neglia's assistance to Wedtech in previous years. Because the jury could conclude that each element of gratuity-receiving had been shown beyond a reasonable doubt as to this charge, Peter Neglia's motion for a judgment of acquittal as to Count Twenty–Five is denied.

*Act 9(a)/Count Twenty–Six: Bribe Receiving*

█ Racketeering Act 9(a) and Count Twenty–Six charge Peter Neglia with agreeing to receive an option for 20,000 shares of Wedtech's stock as a bribe. The evidence relating to elements of this charge is discussed below.

*First Element: Solicitation of, Agreement to Receive, etc. Something of Value for Self or Another*

There is enough evidence for a jury to find proof of this element beyond a reasonable doubt in the following testimony and exhibits:

Mario Moreno testified to a conversation over the inaugural weekend with Peter Neglia and Bernard Ehrlich regarding problems involved in giving either stock or options to Peter Neglia. Peter Neglia said he would look for somebody in whose name he could put options and informed Mario Moreno on at least two separate occasions that he had chosen Ronald Betso. Another witness testified that after Mario Moreno's conversation with Peter Neglia and Bernard Ehrlich at the inaugural weekend occurred, Peter Neglia thanked him for what Wedtech was doing for him. The following exhibits also tend to prove this element: Mario Moreno's secretary's Rolodex with Ronald Betso's social security number on it (GX341), the Minutes of the Board of Directors meeting at which the options for Ronald Betso were approved (GX327A), and an unexecuted copy of the Stock Option Agreement (GX328). Several witnesses testified that Ronald Betso was not a consultant for Wedtech, as he was described on the Minutes and the Option Agreement.

*Second Element: Defendant was a Public Official at the Time*

There was testimony that Peter Neglia was Acting Chief of Staff at the SBA in D.C. in 1985 when the items of value were solicited. This is sufficient evidence for the jury to find proof of this element beyond a reasonable doubt.

*Third Element: Defendant Accepted the Items in Return for Being Influenced in the Performance of his Official Duties*

The jury could find proof beyond a reasonable doubt of this element by considering testimony about the timing of the payments, Peter Neglia's increasingly impor-

tant position in the SBA, and the fact that Wedtech continued to seek new 8(a) contracts and options to extend existing 8(a) contracts during this period.

*Fourth Element: Knowing, Willful, Corrupt Act*

The jury could find proof beyond a reasonable doubt of this element by considering Mario Moreno's testimony regarding Peter Neglia's knowledge that he could not put the options in his own name, his decision to put the options in the name of a close friend, Peter Neglia's request that Mario Moreno hold onto the Option Agreement and his later request that Moreno destroy it.

Therefore, Peter Neglia's motion for a judgment of acquittal as to Count Twenty-Six is denied.

*Act 9(b)/Count Twenty-Seven: Gratuity Receiving*

■ Racketeering Act 9(b) and Count Twenty-Seven charge Peter Neglia with receiving an option for 20,000 shares of Wedtech's stock as a gratuity.

The evidence that may show beyond a reasonable doubt that Peter Neglia knowingly agreed to receive something of value while he was a public official has just been discussed. The jury could find beyond a reasonable doubt that the items of value were sought because of Peter Neglia's official acts (even if not in order to influence them) from testimony regarding the conversation over the inaugural weekend about the need to "compensate" Peter Neglia for the work he had done for Wedtech, testimony regarding Mario Moreno's explanation to Fred Neuberger that the option was being issued to Ronald Betso because of favors performed by Peter Neglia, testimony about the timing of the issuance of the option, and evidence of Peter Neglia's assistance to Wedtech in previous years. Because the jury could find proof beyond a reasonable doubt that Peter Neglia agreed to receive the options as a gratuity, Peter Neglia's motion for a judgment of acquittal as to Count Twenty-Seven is denied.

*Act 10(a)/Count Twenty-Eight: Bribe Receiving*

■ Racketeering Act 10(a) and Count Twenty-Eight charge Peter Neglia with seeking half of his salary at B & E as a bribe. The evidence relating to the four elements of bribe receiving is discussed below.

*First Element: Solicitation of, Agreement to Receive, etc. Something of Value for Self or Another*

The jury could find proof of this element beyond a reasonable doubt by considering the following evidence:

Mario Moreno testified that in the fall of 1984 he had a conversation with Peter Neglia and Bernard Ehrlich concerning Peter Neglia's future employment at B & E. During this conversation, Bernard Ehrlich told Peter Neglia that Bernard Ehrlich had spoken to Mario Moreno and Mario Moreno knew that Peter Neglia wanted to work for B & E and Wedtech would participate in funding Peter Neglia's salary. Mario Moreno also testified to another conversation over the inaugural weekend in which he confirmed that Wedtech had agreed to pay half of Peter Neglia's $100,000 salary at B & E. GX3, a chart of payments to B & E, shows a payment on 12/13/85 of $25,000, which Mario Moreno testified was to cover one half of Neglia's salary for the last six months of 1985.

*Second Element: Defendant was a Public Official at the Time*

There was testimony that Peter Neglia was SBA Regional Director and then Acting Chief of Staff at the SBA in D.C. when Wedtech agreed to pay half of his salary. This is sufficient evidence for the jury to find proof of this element beyond a reasonable doubt.

*Third Element: Defendant Accepted the Items in Return for Being Influenced in the Performance of his Official Duties*

The jury could find proof beyond a reasonable doubt of this element by considering testimony about the timing of the conversations, Peter Neglia's increasingly important position in the SBA, and the fact

that Wedtech continued to seek new 8(a) contracts and options to extend existing 8(a) contracts during this period.

*Fourth Element: Knowing, Willful, Corrupt Act*

The jury could find proof beyond a reasonable doubt of this element by considering Mario Moreno's testimony regarding Peter Neglia's presence at the conversations when the payment was discussed, another witness' testimony that he was told in early 1986 that Peter Neglia's decision to work for B & E was not for public consumption until after Peter Neglia formally left the government, and testimony by Carlos Cuevas that Peter Neglia told him never to tell the SBA that Neglia was working for B & E.

Because the jury could find proof beyond a reasonable doubt of each element of Count Twenty–Eight, Peter Neglia's motion for a judgment of acquittal as to this count is denied.

*Act 10(b)/Count Twenty–Nine: Gratuity Receiving*

 Racketeering Act Ten(b) and Count Twenty–Nine charge Peter Neglia with seeking half his salary at B & E as a gratuity.

The evidence that may show beyond a reasonable doubt that Peter Neglia knowingly agreed to receive something of value while he was a public official has just been discussed. The jury could find beyond a reasonable doubt that the items of value were received because of Peter Neglia's official acts (even if not in order to influence them) from the fact that at least one of the discussions about paying half of Peter Neglia's salary occurred when a Wedtech officer was discussing other means of compensating Peter Neglia, testimony about the timing of the promise to pay, and evidence of Peter Neglia's assistance to Wedtech in previous years. Because the jury could find proof beyond a reasonable doubt that Peter Neglia sought half his salary at B & E from Wedtech as a gratuity, Peter Neglia's motion for a judgment of acquittal as to Count Twenty–Nine is denied.

*Act 17/Count Thirty: False Statements*

] Racketeering Act Seventeen and Count Thirty charge Peter Neglia with making false statements to a Special Agent from DOD's Criminal Investigative Service (DCIS) concerning Wedtech and Peter Neglia's relationship to B & E, in violation of 18 U.S.C. § 1503. An agent for DCIS testified that he interviewed Peter Neglia in a room outside the grand jury room, that Neglia appeared pursuant to a jury subpoena in connection with the present case, and that the agent discussed the subpoena with Neglia. The agent stated that Neglia told him that he (Neglia) could not recall the specifics of the stock ownership agreement that John Mariotta entered in order to establish his 51% ownership of Wedtech after the company went public. Peter Neglia also represented to the agent that he (Neglia) discussed obtaining a job with B & E after Neglia left the SBA. The agent said Neglia mentioned no discussions he had about the job before he left the SBA. The agent said that Neglia claimed not to have spoken to Bernard Ehrlich about Wedtech stock and that Bernard Ehrlich never mentioned that he owned Wedtech stock. On the basis of this testimony and testimony by other witnesses that suggests that these statements were false, the jury would be entitled to find proof beyond a reasonable doubt that Peter Neglia made false statements to the DCIS agent. Therefore, Peter Neglia's motion for a judgment of acquittal as to Count Thirty is denied.

As to the fourth element of Count One, there is sufficient evidence for the jury to find beyond a reasonable doubt that Peter Neglia committed, or aided and abetted the commission of, two or more charged racketeering acts. The evidence of the similar motive, participants, victims and other factors is enough for the jury to find beyond a reasonable doubt that the acts were performed as part of a pattern of racketeering activity. Therefore, the jury may find beyond a reasonable doubt that the fourth element of the RICO charge has been established.

*Fifth Element: Conducting or Participating in the Conduct of the Affairs of the Enterprise Through that Pattern of Racketeering Activity*

 The evidence already described in connection with the fourth element of Count One also provides a sufficient basis for a jury to find beyond a reasonable doubt that as a result of his public position and through bribe or gratuity-receiving, defendant conducted and participated, directly and indirectly, in the affairs of Wedtech. Peter Neglia's motion for a judgment of acquittal as to Count One is denied.

## PETER NEGLIA—COUNT TWO: RICO CONSPIRACY

 Count Two charges Peter Neglia with conspiring to conduct, or participate in the conduct of, Wedtech through a pattern of racketeering activity. The first three elements of Count Two have already been addressed. As I have already indicated, there is enough evidence for the jury to find these three elements proved beyond a reasonable doubt. The fourth element of RICO conspiracy is the unlawful, knowing, willful agreement to do at least two racketeering acts as listed in Count One through a pattern of racketeering activity. The evidence already discussed with respect to Count One that Peter Neglia actually committed racketeering acts 6, 8, 9, and 10 as part of a pattern of racketeering activity is also sufficient for a jury to find beyond a reasonable doubt that Peter Neglia agreed to commit these acts as part of a pattern of racketeering activity. Therefore, Peter Neglia's motion for a judgment of acquittal as to Count Two is denied.

## JOHN MARIOTTA—COUNT ONE: RICO

In Count One, John Mariotta is charged with unlawfully, willfully, and knowingly conducting, or participating in the conduct of, Wedtech through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and (5). The first two of the five elements of this RICO charge have already been discussed. The last three elements are discussed below.

*Third Element: Association with the Enterprise*

 There has been enough evidence for a jury to find proof beyond a reasonable doubt of this element in repeated testimony that John Mariotta was a founder, President, CEO and Chairman of the Board of Wedtech, that he owned a large amount of Wedtech's outstanding stock, and that he represented himself to the SBA as owning more than 50% of Wedtech's stock.

*Fourth Element: Engaging in a Pattern of Racketeering Activity by Committing At Least Two Acts of Racketeering Activity*

*Act 5/Count Thirty–One: Mail Fraud*

 In Racketeering Act 5 and Count Thirty–One, John Mariotta is charged with mail fraud against DOD by filing false Personal Financial Statements for 1981 and 1982 in connection with SBA applications for loans needed to complete 8(a) contracts.

The jury could find proof beyond a reasonable doubt of all three elements of this count of mail fraud in the following evidence:

*First Element: Existence of a Fraudulent Scheme*

John Mariotta's PFSs for 1981 and 1982 are admitted as GX128 and GX132. There was testimony that both documents were submitted to the SBA as part of the documentation required for obtaining an Fixed Program Participation Term (FPPT) extension. GX128 states John Mariotta's ownership interest in Wedtech as ⅔ and GX132 states that John Mariotta owns 66% of Wedtech stock. Testimony by Mario Moreno and Fred Neuberger indicated that John Mariotta owned only 45.5% of Wedtech stock at the time John Mariotta signed those documents. The government also introduced two executed Agreements, dated 8/21/81 and prepared by Delson & Gordon, confirm stock ownership by John Mariotta, Fred Neuberger, and Mario Moreno in the ratio of 45.5%/45.5%/9% (GX 126A, B).

*Second Element: Intentional Participation in the Scheme*

Mario Moreno testified that John Mariotta, Fred Neuberger, and Mario Moreno agreed not to reveal the true stock ownership to the SBA because it would result in termination from the 8(a) program. John Mariotta's signature on the PFSs and the stock transfer agreements is evidence that he knowingly misstated his stock ownership.

*Third Element: Use of the Mails in Execution of the Scheme*

There was testimony that the FPPT file containing the PFSs was sent to the SBA in D.C. The witness testified that files were normally sent by mail. There has also been testimony that Wedtech did in fact receive the requested FPPT extension.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Thirty-One, John Mariotta's motion for a judgment of acquittal as to this count is denied.

*Act 6/Count Thirteen: Mail Fraud*

 Racketeering Act Six and Count Thirteen charge John Mariotta with mail fraud against DOD by devising, executing, and submitting sham Stock Purchase Agreements (SPAs) to the Government in connection with Wedtech's attempt to remain eligible to receive Department of Defense (DOD) contracts through the 8(a) program.

Each element of mail fraud is discussed below.

*First Element: Existence of a Fraudulent Scheme*

A jury could conclude from the following evidence that the government proved the first element of mail fraud beyond a reasonable doubt:

Several witnesses testified that in order to cure a technical default that occurred when Wedtech went public, the Wedtech officers and their lawyers devised a scheme whereby stock would apparently be transferred to John Mariotta until he owned more than 51%. Part of the scheme was that John Mariotta would agree to pay for the stock in installments, the first of which would be due in two years, and when payment became due, he would default. Government witnesses testified that John Mariotta repeatedly promised to default in the presence of the transferors and Congressman Biaggi. The agreement to default was not included as part of the SPA submitted to the SBA. At least one witness testified that in light of the side agreement to default, he did not believe that the SPA provided a good faith basis for recertification of Wedtech in the 8(a) program. Two SPAs, one transferring stock from Mario Moreno, Lawrence Shorten, Anthony Guariglia, and Fred Neuberger to John Mariotta and one transferring stock from Bernard Ehrlich and Richard Biaggi to John Mariotta are in evidence, as are the associated Escrow Agreements. (GX163A–D) Also in evidence are two Rescission Agreements among the aforementioned parties, which resulted in a reversion of the stock to the original transferors without the negative tax consequences attendant to them upon a default. (GX204) The Rescission Agreements were executed just weeks before John Mariotta was scheduled to default on the first payment.

*Second Element: Intentional Participation in the Scheme*

There is sufficient evidence for the jury to find proof beyond a reasonable doubt of the second element of this act of mail fraud, as applied to John Mariotta, in the following evidence:

There was testimony from a number of witnesses about several meetings attended by John Mariotta at which the SPA was explained. These witnesses also testified that John Mariotta repeatedly promised to default. The Government also introduced copies of Rescission Agreements between the parties who had executed the SPAs, whereby John Mariotta returned the stock in a fashion designed to avoid the negative tax consequences that the transferors would have incurred upon his default. These agreements were executed between the aforementioned parties on December 17, 1985, only weeks before John Mariotta

was scheduled to default on the first payment.

*Third Element: Use of the Mails in Execution of the Scheme*

A jury could infer from the following evidence that this element was proved beyond a reasonable doubt:

A witness testified that Peter Neglia said Bernard Ehrlich better be right about the SPAs because Peter Neglia was going to send them from New York to the SBA in D.C. Various correspondence retrieved from the SBA files regarding the SPAs is in evidence. There was also testimony and documentary evidence that the SPAs themselves were sent through the mails.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Thirteen, John Mariotta's motion for a judgment of acquittal as to this count is denied.

*Act 7/Count Thirty–Two: Mail Fraud*

 Racketeering Act 7 and Count Thirty–Two charge John Mariotta with mail fraud against Wedtech by using the F.H.J. Associates checking account to divert $5.5 million dollars from the company.

The Supreme Court has consistently held that to find a violation of the mail fraud statute, each mailing charged in the Indictment must have been made " 'for the purpose of executing the [fraudulent] scheme.' " *United States v. Lane,* 474 U.S. 438, 451, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) (quoting *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 150, 89 L.Ed. 88 (1944)). In the present case, the only mailings charged as to Racketeering Act 7 and Count Thirty–Two are the mailings to Washington, D.C. of two F.H.J. checks payable to Concourse Video and dated January 9, 1985 and March 14, 1985. There has been no evidence that these checks were mailed for the purpose of diverting money from Wedtech to the F.H.J. account and the Wedtech officers. To the contrary, all the evidence shows that when the checks were mailed, the diversion scheme "had reached fruition. The persons intended to receive the money had received it. . . ." *Kann,* 323 U.S. at 94, 65 S.Ct. at 150. The mailings merely disposed of money that

had already been obtained by means of the kickback schemes described by the Government's witnesses. The mailings neither advanced those schemes nor served to conceal them.

The Government argues that the mailings of the checks to Concourse Video were part of the fraudulent scheme alleged in Racketeering Act 7 and Count Thirty–Two. It says that because John Mariotta did not have signatory power over the F.H.J. account, he did not actually benefit from the fraudulent scheme until money from the account was distributed to him or his designees. On this basis, the Government endeavors to distinguish this case from *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). In *Maze,* the defendant stole a credit card and used it to purchase food and lodging. The establishments at which Maze used the card thereafter mailed invoices, seeking payment for the items Maze had purchased, to the bank that had issued the credit card. Upon considering the mail fraud counts against Maze, which were based on the mailings of the invoices, the Supreme Court determined that the fraud had been completed when Maze used the credit card and that the mailings after the fact were not made "for the purpose of executing" the scheme. See *Maze,* 414 U.S. at 406, 94 S.Ct. at 651 (quoting 18 U.S.C. § 1341). The Government contends that in *Maze,* the defendant obtained the benefit of the scheme as soon as he used the credit card, but John Mariotta did not benefit from the F.H.J. account until funds were distributed from it, as they were when the checks were mailed to D.C. to cover his investment in Concourse Video.

The court finds this argument unpersuasive. The evidence did indeed show that Mariotta did not have signatory power over the account. Mariotta had *control* over his share of the account, however, as soon as the funds were deposited in it. The evidence showed that Ceil Lewis and Anthony Guariglia served as Mariotta's agents in administering the account and that they automatically disbursed funds to him or on his behalf upon his request. The money

was effectively in his possession once the kickbacks were made. Checks mailed to spend the F.H.J. funds did not advance the scheme or help to conceal it.

For this reason, the court dismisses Racketeering Act 7 and grants John Mariotta's motion for acquittal as to Count Thirty-Two.

### Act 11: Bribery

 Racketeering Act 11 alleges that under New York law John Mariotta bribed Stanley Simon by offering him $50,000. The jury could find proof beyond a reasonable doubt of the elements of bribery under New York law in the following evidence:

*First Element: Offer to Confer a Benefit Upon a Public Servant*

Mario Moreno testified that he was present at a meeting during which John Mariotta was informed that Stanley Simon had been promised $50,000 to be distributed according to his directions. Fred Neuberger testified that he informed John Mariotta of the promise to Stanley Simon. Anthony Guariglia testified that Ceil Lewis told him that she had been informed by John Mariotta and Mario Moreno about the promise to pay $50,000. There was also testimony that the $50,000 was actually paid from F.H.J. funds, and the relevant checks are in evidence. The evidence that Stanley Simon was the Bronx Borough President at the time the offer was made has already been discussed.

*Second Element: Offer Made Upon an Understanding that the Public Servant Would be Influenced in his Official Acts*

There was testimony that the offer was made in June 1984, before the final vote of the Board of Estimate on the lease for One Loop Drive, and that Wedtech knew that if it did not obtain the lease, it would lose the pontoon contract. Witnesses also attested to the belief of Wedtech's officers in the importance of Stanley Simon in securing that lease and for Wedtech's continuing success in the Bronx.

### Act 12(a)/Count Forty-Two: Bribery

 Racketeering Act 12(a) and Count Forty-Two charge John Mariotta with bribing Congressman Biaggi by promising and giving him 5% of Wedtech's stock.

The jury could find proof beyond a reasonable doubt that John Mariotta bribed Congressman Biaggi with 5% of Wedtech's stock on the basis of the following evidence:

*First Element: Promising, Giving Something of Value to a Public Official*

Several witnesses testified that John Mariotta promised 5% of Wedtech's stock to Congressman Biaggi. Mario Moreno testified that he, John Mariotta, and Fred Neuberger did not ask B & E to draft their agreement regarding the 45.5/45.5/9 percent stock transfer because John Mariotta had promised Congressman Biaggi and Bernard Ehrlich stock and Wedtech was afraid that if the Agreement came to the attention of Congressman Biaggi and Bernard Ehrlich, they would insist on having the 5% transferred to them. Mario Moreno also testified that when Bernard Ehrlich discovered the agreement, he asked for and obtained a copy, which he used as a model for an agreement to transfer stock to B & E. The draft is in evidence as GX15 and the final signed agreements, drafted by Delson & Gordon, are GX18A–D. Several government witnesses recounted a meeting during which Congressman Biaggi sought to confirm John Mariotta's commitment and Fred Neuberger tried to bargain Congressman Biaggi down to 2%. The Prospectus (GX149) and GX18A–D show that 5% of Wedtech's stock was issued to Bernard Ehrlich and Richard Biaggi. Irwin Wolf testified that he believed on the basis of a meeting he had attended that Richard Biaggi was a nominee for Congressman Biaggi. Anthony Guariglia testified that John Mariotta promised the stock to Congressman Biaggi and that Anthony Guariglia believed that Richard Biaggi was a nominee for Congressman Biaggi. The evidence that Congressman Biaggi was a congressman from the Bronx at the time the promise was made has already been discussed.

*Second Element: Offer Made to Influence Acts*

Fred Neuberger testified that John Mariotta insisted upon giving 5% because Con-

gressman Biaggi could not do Wedtech any good if he disliked them and because he could do a lot of damage. Another witness testified that the stock was given in exchange for Congressman Biaggi's help with local politicians. There is testimony that Congressman Biaggi threatened to break the company if he were not given the stock.

*Third Element: Offer Made Knowingly, Willfully, Corruptly*

The witnesses testified that the promise originated with John Mariotta and that he defended it. There was also testimony that John Mariotta was present when the fact that the stock could not be put in Congressman Biaggi's name was discussed.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Forty–Two, John Mariotta's motion for a judgment of acquittal as to this count is denied.

*Act 12(b)/Count Forty–Three: Offering a Gratuity*

 Racketeering Act 12(b) and Count Forty–Three charge John Mariotta with offering 5% of Wedtech's stock to Congressman Biaggi as a gratuity.

The first element of this charge is the same as for the one just discussed.

*Second Element: Offer Made Because of Official Acts Performed or to be Performed*

The evidence reviewed with respect to the second element of Count Forty–Two in conjunction with testimony that the stock was offered in return for services in the past suffices for the jury to find beyond a reasonable doubt that the stock payment was made because of Congressman Biaggi's official acts.

*Third Element: Things Offered or Given Otherwise Than as Provided by Law for the Proper Discharge of Duties*

The evidence that John Mariotta knew that the stock could not be given in Congressman Biaggi's name and that it was in fact given to Bernard Ehrlich and Richard Biaggi is enough for the jury to find proof beyond a reasonable doubt of this element.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Forty–

Three, John Mariotta's motion for a judgment of acquittal as to this count is denied.

*Act 13/Count Forty–Four: Bribery*

 Racketeering Act 13 and Count Forty–Four charge that John Mariotta gave Congressman Biaggi a $50,000 bribe. The evidence relating to this charge is discussed below.

*First Element: Promising, Giving Something of Value to a Public Official*

The fact that Congressman Biaggi was a public official in 1984 has already been addressed. Mario Moreno testified about a meeting in which Congressman Biaggi said that the $50,000 Wedtech agreed to pay for assistance with One Loop Drive was too little. Mario Moreno said it would be enough. Anthony Guariglia also testified about a meeting in which John Mariotta told Congressman Biaggi that Wedtech would pay $50,000 for help with One Loop Drive. Anthony Guariglia told Bernard Ehrlich how to fill out the invoice. GX3E–8 and GX409 have been identified as the Wedtech check and the B & E invoice describing the payment as a fee for help with a Ports and Terminals matter.

*Second Element: Offer Made to Influence Official Acts*

The invoice is dated June 19, 1984 and was stamped received by Wedtech on June 26, 1984. The check was dated July 13. The meeting of the Board of Estimate in which the final vote on One Loop Drive took place was the very next day. Considering the timing of these events, the jury could conclude beyond a reasonable doubt that the payment was made to influence Congressman Biaggi's lobbying effort on Wedtech's behalf.

*Third Element: Offer Made Knowingly, Willfully, Corruptly*

Mario Moreno testified that he told John Mariotta about the $50,000 payment to be made to Congressman Biaggi. Anthony Guariglia testified that John Mariotta, himself, informed Congressman Biaggi about the payment.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Forty–Four, John Mariotta's motion for a judgment of acquittal as to this count is denied.

### Act 15(a)/Count Forty–Seven: Bribery

█] Racketeering Act 15(a) and Count Forty–Seven charge John Mariotta with offering an option for 20,000 shares of Wedtech stock to Peter Neglia as a bribe.

The jury could find beyond a reasonable doubt that John Mariotta offered an option for 20,000 shares of Wedtech stock in Betso's name to influence Peter Neglia's official acts by considering the evidence already mentioned when the court discussed Racketeering Act 9(a) in conjunction with testimony that Mario Moreno told John Mariotta about the promise, that John Mariotta was present when it was explained that Betso was a nominee for Peter Neglia, and that John Mariotta voted to issue the stock option to Betso.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Forty–Seven, John Mariotta's motion for a judgment of acquittal as to this count is denied.

### Act 15(b)/Count Forty–Eight: Offering a Gratuity

█ Racketeering Act Fifteen(b) and Count Forty–Eight charge John Mariotta with offering Peter Neglia an option for 20,000 share of Wedtech stock as a gratuity.

The jury could find beyond a reasonable doubt that John Mariotta offered an option for 20,000 shares of Wedtech stock in Betso's name because of Peter Neglia's official acts, and that the options were offered otherwise than as provided by law for the proper discharge of duties, by considering the evidence already mentioned when the Court discussed Racketeering Act 9(b) in conjunction with testimony that Mario Moreno told John Mariotta about the promise, that John Mariotta was present when it was explained that Betso was a nominee for Peter Neglia, and that John Mariotta voted to issue the stock option to Betso without revealing the latter fact to the outside directors.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Forty–Eight, John Mariotta's motion for a judgment of acquittal as to this count is denied.

As to the fourth element of Count One, there is sufficient evidence for the jury to find beyond a reasonable doubt that John Mariotta committed two or more charged racketeering acts. There has also been evidence that John Mariotta committed at least two of the charged racketeering acts knowing that they were part of Wedtech's ongoing illegal activity and that he therefore engaged in a pattern of racketeering activity through these acts. Therefore, the jury may find beyond a reasonable doubt that the fourth element of the RICO charge has been established.

### Fifth Element: Conducting or Participating in the Conduct of the Affairs of the Enterprise Through that Pattern of Racketeering Activity

The evidence already described in connection with the fourth element of Count One also provides a sufficient basis for a jury to find beyond a reasonable doubt that as a result of his ownership interest and executive positions, defendant John Mariotta conducted, and participated in the conduct of, directly and indirectly, the affairs of Wedtech. Therefore, John Mariotta's motion for a judgment of acquittal as to Count One is denied.

### JOHN MARIOTTA—COUNT TWO: RICO CONSPIRACY

█ The first three elements of Count Two have already been addressed in discussing Count One. As I have already indicated, there is enough evidence for the jury to find these three elements proved beyond a reasonable doubt. The fourth element of RICO conspiracy is the unlawful, knowing, willful agreement to do at least two racketeering acts as listed in Count One through a pattern of racketeering activity. The evidence already discussed with respect to Count One that John Mariotta actually committed racketeering acts five, six, eleven, twelve, thirteen, four-

teen, and fifteen as part of a pattern of racketeering activity is also sufficient for a jury to find beyond a reasonable doubt that John Mariotta agreed to engage in a pattern of racketeering activity through these acts.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Two, John Mariotta's motion for a judgment of acquittal as to this count is denied.

### JOHN MARIOTTA—COUNTS THIRTY-THREE THROUGH THIRTY-SIX: INCOME TAX EVASION

Counts 33-36 charge John Mariotta with tax evasion for the years 1981, 1982, 1984, and 1985. In evidence are John Mariotta's tax returns for those years (GX764A, B, D, E) as well as work papers used by the accountants who prepared his taxes. A handwriting expert testified that the signature on the tax returns was John Mariotta's. The accountants testified that John Mariotta did not declare income from F.H.J. on his tax returns. Other witnesses testified that John Mariotta received substantial income—from tens to hundreds of thousands of dollars—from F.H.J. during those years. An IRS agent testified about his calculations of the disbursements from the F.H.J. account to Mariotta for 1981, 1982, 1984, and 1985. His calculations are summarized on charts in evidence. (GX1201, 1202, 1204, 1205) The agent also testified about his calculations of the tax due and owing on John Mariotta's tax returns for 1981, 1982, 1984, and 1985. Charts showing his calculations are also in evidence. (GX1201A, 1202A, 1204A, 1205A) There was also testimony that John Mariotta suggested opening, and later reviving, F.H.J. in order to receive money off the books. From this evidence, the jury could find proof beyond a reasonable doubt that as to each of these years, John Mariotta owed substantially more federal income tax for the calendar years charged than he declared, that he knew he owed substantially more, and that he knowingly attempted to evade the tax and defraud the government by declaring an income substantially lower than the full amount he earned.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Counts Thirty-Three through Thirty-Six, John Mariotta's motion for a judgment of acquittal as to these counts is denied.

### JOHN MARIOTTA—COUNTS THIRTY-SEVEN, THIRTY-EIGHT, FORTY AND FORTY-ONE: PERJURED INCOME TAX RETURNS

The Government has withdrawn Count Thirty-Nine of the Indictment. Counts Thirty-Seven, Thirty-Eight, Forty, and Forty-One charge John Mariotta with deliberately making false statements on his income tax returns for the years 1981, 1982, 1984, and 1985. In evidence are John Mariotta's tax returns for those years (GX764A–E) as well as work papers used by the accountants who prepared his taxes. Each tax return contains a written declaration that it was made under the penalties of perjury. A handwriting expert testified that the signature on the tax returns was John Mariotta's. The accountants testified that John Mariotta did not declare income from F.H.J. on his tax returns. An IRS agent also testified about his calculations of the tax due and owing on John Mariotta's tax returns for 1981, 1982, 1984, and 1985. Charts showing his calculations are also in evidence. (GX1201A, 1202A, 1204A, 1205A) From this evidence, the jury could find proof beyond a reasonable doubt that as to each of these years, John Mariotta made and subscribed the return in question, that the return contained a written declaration that it was made under the penalties of perjury, that John Mariotta did not believe that the return was true and correct as to every material matter, and that John Mariotta acted knowingly and willfully at the time he signed the return.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Counts Thirty-Seven, Thirty-Eight, Forty, and Forty-One, John Mariotta's motion for a judgment of acquittal as to these counts is denied.

## BERNARD EHRLICH—COUNT ONE: RICO

In Count One, Bernard Ehrlich is charged with unlawfully, willfully, and knowingly conducting or participating in the conduct of Wedtech through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and (5). The first two of the five elements of this RICO charge have already been discussed. The last three elements are discussed below.

*Third Element: Association with the Enterprise*

■■■] The jury may find proof beyond a reasonable doubt that Bernard Ehrlich was a partner in B & E, that B & E was retained as Wedtech's outside counsel and that Bernard Ehrlich performed almost all of the services provided by B & E to Wedtech, that B & E received in excess of $900,000 in legal and other fees from Wedtech, that Bernard Ehrlich was a large shareholder in Wedtech, and that Bernard Ehrlich became a member of Wedtech's Board of Directors in 1986.

*Fourth Element: Engaging in a Pattern of Racketeering Activity by Committing, or Aiding and Abetting the Commission of, At Least Two Acts of Racketeering Activity*

*Act 1(a)/Count Three: Aiding and Abetting Extortion*

■■■ Racketeering Act 1(a) and Count Three charge Bernard Ehrlich with aiding and abetting Congressman Biaggi's extortion of 5% of Wedtech's outstanding stock from Wedtech.

The evidence of this count as to Congressman Biaggi has already been discussed. There has been testimony by several witnesses that Bernard Ehrlich was present at a meeting when Congressman Biaggi threatened to break Wedtech if he did not receive the promised 5% of Wedtech's stock. There has also been testimony that prior to this meeting, Bernard Ehrlich had been actively seeking to have John Mariotta's promise of stock to Congressman Biaggi formalized. Irwin Wolf testified about a meeting attended by Bernard Ehrlich and Congressman Biaggi in which the participants agreed that the only way to give Congressman Biaggi stock was to put it in Richard Biaggi's name. There is documentary evidence that Bernard Ehrlich and Richard Biaggi actually received two and a half percent of the Wedtech stock. Therefore, a jury could find proof beyond a reasonable doubt that Bernard Ehrlich aided and abetted Congressman Biaggi's extortion of 5% of Wedtech's stock from Wedtech, and Bernard Ehrlich's motion for a judgment of acquittal as to Count Three is for this reason denied.

*Act 1(b)/Count Four: Aiding and Abetting Bribe Receiving*

Racketeering Act 1(b) and Count Four charge Bernard Ehrlich with aiding and abetting Congressman Biaggi's demand and receipt of 5% of Wedtech's stock as a bribe.

The evidence of this count as to Congressman Biaggi has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Three also would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Four. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Four is denied.

*Act 1(c)/Count Five: Aiding and Abetting Gratuity Receiving*

Racketeering Act 1(c) and Count Five charge Bernard Ehrlich with aiding and abetting Congressman Biaggi's demand and receipt of 5% of Wedtech's stock as a gratuity.

The evidence of this count as to Congressman Biaggi has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Three also would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Five. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Five is denied.

### Act 1(d)/Count Six: Mail Fraud

Racketeering Act 1(d) and Count Six charge Bernard Ehrlich with mail fraud in connection with Congressman Biaggi's demand and receipt of 5% of Wedtech's stock.

The evidence of this count as to Congressman Biaggi has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Three also would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Six. All the evidence just mentioned, moreover, would also permit a jury to find that Bernard Ehrlich himself committed the mail fraud charged in Count Six. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Six is denied.

### Act 2(a)/Count Ten: Aiding and Abetting Extortion

Racketeering Act 2(a) and Count Ten charge Bernard Ehrlich with aiding and abetting Congressman Biaggi's extortion of $50,000 from Wedtech.

The evidence of this count as to Congressman Biaggi has already been reviewed. There is evidence that Bernard Ehrlich attended the meeting at which Congressman Biaggi demanded $50,000 for help with One Loop Drive. Mario Moreno testified that Bernard Ehrlich also made the demand. Anthony Guariglia testified that he told Ehrlich how to fill out the invoice for the payment. The invoice, filled out according to Guariglia's directions, and the Wedtech check covering the payment are in evidence (GX409). From this evidence, the jury could find proof beyond a reasonable doubt that Bernard Ehrlich aided and abetted Congressman Biaggi in extorting $50,000 from Wedtech. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count Ten is denied.

### Act 2(b)/Count Eleven: Aiding and Abetting Bribe Receiving

Racketeering Act 2(b) and Count Eleven charge Bernard Ehrlich with aiding and abetting Congressman Biaggi's demand and receipt of a $50,000 bribe from Wedtech.

The evidence of this count as to Congressman Biaggi has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Ten also would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Eleven. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Eleven is denied.

### Act 2(c)/Count Twelve: Mail Fraud

Racketeering Act 2(c) and Count Twelve charge Bernard Ehrlich with mail fraud in connection with Congressman Biaggi's demand and receipt of $50,000 from Wedtech.

The evidence of this count as to Congressman Biaggi has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Ten also would permit a jury to find that Bernard Ehrlich aided and abetted Congressman Biaggi's commission of Count Twelve. All the evidence discussed, moreover, would also permit a jury to find that Bernard Ehrlich himself committed the mail fraud charged in Count Twelve. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Twelve is denied.

### Act 6/Count Thirteen: Mail Fraud

Racketeering Act 6 and Count Thirteen charge Bernard Ehrlich with mail fraud against DOD by devising, executing, and submitting sham SPAs to the Government in connection with Wedtech's attempt to remain eligible to receive DOD contracts through the 8(a) program.

The first and the third elements of this act of mail fraud were discussed when the Court reviewed the evidence of Count Thirteen as applied to Peter Neglia. There is sufficient evidence for the jury to find proof beyond a reasonable doubt of the second element of this act of mail fraud, as applied to Bernard Ehrlich in the following evidence:

Several witnesses testified that Bernard Ehrlich was present at a number of meet-

ings at which the SPA was devised and explained and that he relayed the proposed methods for obtaining recertification to Peter Neglia. There has been testimony that Ehrlich was present on several occasions when John Mariotta promised to default on the payment and he said the submission of the SPA should not be a problem because he was friendly with Peter Neglia. Ehrlich delivered the message from Peter Neglia that Neglia didn't care what the agreement was "between us girls" as long as it stood up with the SBA. Ehrlich signed the one-year SPA (GX163C–1, C–2) accepted by Congressman Biaggi and extended it for an additional year upon Wedtech's request. On the basis of this evidence the jury could find beyond a reasonable doubt that Bernard Ehrlich committed this count of mail fraud, so his motion for a direct verdict as to Count Thirteen is denied.

*Act 8(a)/Count Twenty–Four: Aiding and Abetting Bribe Receiving*

Racketeering Act Eight(a) and Count Twenty–Four charge Bernard Ehrlich with aiding and abetting Neglia's receipt of a $4,500 bribe.

The evidence of this count as to Peter Neglia has already been discussed. The jury could find proof beyond a reasonable doubt that Bernard Ehrlich aided and abetted Peter Neglia's commission of this Count by considering evidence that 1) Wedtech funded Empire Club dinner-dance tickets for Peter Neglia and Joseph Neglia in 1984 and that Bernard Ehrlich was scheduled to sit with Peter Neglia, Joseph Neglia, and Mario Moreno at that dinner-dance, 2) Bernard Ehrlich directed Anthony Guariglia to pay for tickets and make reservations for Peter Neglia, Joseph Neglia, and Ronald Betso for the inaugural weekend, and 3) Bernard Ehrlich submitted a $500 check at the same time Anthony Guariglia submitted his $2,500 check to pay for dinner-dance tickets for Peter Neglia, Joseph Neglia, and Mario Moreno. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Four is denied.

*Act 8(b)/Count Twenty–Five: Aiding and Abetting Gratuity Receiving*

Racketeering Act 8(b) and Count Twenty–Five charge Bernard Ehrlich with aiding and abetting Neglia's receipt of a $3,000 gratuity.

The evidence of this count as to Peter Neglia has already been discussed. The evidence that would permit a jury to find that Bernard Ehrlich aided and abetted Peter Neglia's commission of Count Twenty–Four also would permit a jury to find that Bernard Ehrlich aided and abetted Peter Neglia's commission of Count Twenty–Five. Therefore Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Five is denied.

*Act 9(a)/Count Twenty–Six: Aiding and Abetting Bribe Receiving*

Racketeering Act 9(a) and Count Twenty–Six charge Bernard Ehrlich with aiding and abetting Peter Neglia's agreement to receive a stock option for 20,000 shares of Wedtech stock as a bribe.

The evidence of this count as to Peter Neglia has already been discussed. The jury could find proof beyond a reasonable doubt that Bernard Ehrlich aided and abetted Neglia in committing this racketeering act and count by considering the following evidence.

Mario Moreno testified about a conversation with Bernard Ehrlich and Peter Neglia over the inaugural weekend regarding the problems involved in giving either stock or options to Peter Neglia. Moreno also testified that Ehrlich was present at a dinner when Joseph Neglia said he wanted the paperwork completed. There was testimony that at Joseph Neglia's birthday party, Bernard Ehrlich said it was time to finalize the stock options for Peter Neglia, and Peter Neglia said he wanted everything in Betso's name. At the same time, Ehrlich recommended that Wedtech continue to think about a job for Ronald Betso. There was further testimony that Ehrlich relayed the message to Joseph Neglia that Wedtech needed Ronald Betso's social security number in order to issue the options.

Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Six is for these reasons denied.

*Act 9(b)/Count Twenty–Seven: Aiding and Abetting Gratuity Receiving*

Racketeering Act 9(b) and Count Twenty–Seven charge Bernard Ehrlich with aiding and abetting Peter Neglia's agreement to receive a stock option for 20,000 shares of Wedtech stock as a gratuity.

The evidence that Bernard Ehrlich aided and abetted Peter Neglia in receiving the bribe described in Racketeering Act 9(a) and Count Twenty–Six would also permit the jury to find beyond a reasonable doubt that Bernard Ehrlich aided and abetted Peter Neglia in soliciting an option for 20,000 shares of Wedtech stock as a gratuity. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Seven is denied.

*Act 10(a)/Count Twenty–Eight: Aiding and Abetting Bribe Receiving*

Racketeering Act 10(a) and Count Twenty–Eight charge Bernard Ehrlich with aiding and abetting Peter Neglia's solicitation of half of Neglia's salary at B & E from Wedtech as a bribe.

The evidence pertaining to this count as to Peter Neglia has already been reviewed. The testimony that Bernard Ehrlich informed Peter Neglia in the fall of 1984 and again over the inaugural weekend that Ehrlich had spoken to Moreno about having Wedtech assist in funding Neglia's salary at B & E would permit the jury to find proof beyond a reasonable doubt that Bernard Ehrlich aided and abetted Peter Neglia in soliciting from Wedtech half of Neglia's salary at B & E once Neglia left government service. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Eight is denied.

*Act 10(b)/Count Twenty–Nine: Aiding and Abetting Gratuity Receiving*

Racketeering Act 10(b) and Count Twenty–Nine charge Bernard Ehrlich with aiding and abetting Peter Neglia's solicitation of half of Neglia's salary at B & E from Wedtech as a gratuity.

The evidence that Bernard Ehrlich aided and abetted Peter Neglia in receiving the bribe described in Racketeering Act 10(a) and Count Twenty–Eight would also permit the jury to find beyond a reasonable doubt that Bernard Ehrlich aided and abetted Peter Neglia in soliciting from Wedtech half of Neglia's salary at B & E once Neglia left government service as a gratuity. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count Twenty–Nine is denied.

As to the fourth element of Count One, there is sufficient evidence for the jury to find beyond a reasonable doubt that Bernard Ehrlich committed, or aided and abetted the commission of, two or more charged racketeering acts. There has also been evidence that he committed at least two of the charged racketeering acts knowing that they were part of Wedtech's ongoing illegal activity and that he therefore engaged in a pattern of racketeering activity through these acts. Therefore, the jury may find beyond a reasonable doubt that the fourth element of the RICO charge has been established.

*Fifth Element: Conducting or Participating in the Conduct of the Affairs of the Enterprise Through that Pattern of Racketeering Activity*

The evidence already described in connection with the fourth element of Count One also provides a sufficient basis for a jury to find beyond a reasonable doubt that as a result of Bernard Ehrlich's counsel relationship with Wedtech and his association with Congressman Biaggi, defendant Bernard Ehrlich participated, directly and indirectly, in the affairs of Wedtech. Therefore, Bernard Ehrlich's motion for a judgment of acquittal as to Count One is denied.

## BERNARD EHRLICH—COUNT TWO: RICO CONSPIRACY

The first three elements of Count Two have already been addressed in discussing Count One. As this court has already indicated, there is enough evidence for the jury to find these three elements proved beyond a reasonable doubt.

The fourth element of RICO conspiracy is the unlawful, knowing, willful agreement to do at least two racketeering acts as listed in Count One through a pattern of racketeering activity. The evidence already discussed with respect to Count One that Bernard Ehrlich actually participated in the conduct of Wedtech's affairs by committing racketeering acts one, two, six, eight, nine, and ten as part of a pattern of racketeering activity is also sufficient for a jury to find beyond a reasonable doubt that he agreed to participate in the conduct of Wedtech's affairs through a pattern of racketeering activity.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Two, Bernard Ehrlich's motion for a judgment of acquittal as to this count is denied.

## RICHARD BIAGGI—COUNT ONE: RICO

*Third Element—Association with the Enterprise*

■ The court finds that the Government has introduced sufficient evidence of Richard Biaggi's association with the Wedtech Corporation to survive a motion for judgment of acquittal as to this element of Count One. Although all witnesses who addressed the issue testified that he did little legal work for Wedtech, Mario Moreno observed that at one point he did indeed do considerable Wedtech-related work: in Moreno's words, he "had a lot of meetings" with Anthony Guariglia & Squadron Ellenoff in connection with the stock issuance to himself and Ehrlich. Irwin Wolf also placed him at the center of activity on the stock issuance. Wolf testified that Richard Biaggi definitely attended the meeting at which it was allegedly determined that the only way to achieve the effects Congressman Biaggi wanted from the stock issuance was to give the stock to Richard rather than to B & E or Ehrlich and the Congressman.

Richard Biaggi and Ehrlich were sole owners and officers of Four Star and Five Star, corporations whose sole reason for being, according to the testimony, was to collect kickbacks on Wedtech subcontracts.

The testimony of Carlos Cuevas, Jr. established relations between Richard Biaggi and Wedtech. Although he may not, in general, have done much legal work for Wedtech, Richard Biaggi did ask Cuevas to prepare at least one memo on a question related to the stock issuance. Cuevas testified, moreover, that Richard Biaggi attended the Board of Estimate meetings about Wedtech's application for the One Loop Drive property.

Finally, the stock certificates were issued in Richard Biaggi's name. There is an exhibit in evidence, a covering letter from Arthur Siskind to Richard Biaggi, that is countersigned by Richard Biaggi, acknowledging receipt of the certificates.

*Fourth and Fifth Elements: Pattern of Racketeering Activity/Conduct of the Enterprise*

*Act 1(a)/Count Four: Aiding and Abetting Bribe Receiving*

■ Act 1(a) and Count Four charge Richard Biaggi with aiding and abetting an act of bribe receiving, the receipt of the Wedtech stock by Congressman Biaggi. Richard Biaggi's willful association with this alleged criminal venture and his devotion of effort to make it succeed, as required for aiding and abetting, are manifested in at least three ways. First, and most important, he lent his name to the stock purchase agreement. Second, he attended the meeting at which, according to Irwin Wolf, the stock issuance plan was conceived and it was determined that the only way to issue the stock that would achieve Congressman Biaggi's goals was to do it in his son's name. Third, he did considerable legal work—more than on anything else in his life, one could infer from the evidence—at Squadron Ellenoff and in conjunction with Anthony Guariglia on the stock issuance documents.

*Act 1(b)/Count Five: Aiding and Abetting Gratuity Receiving*

Act 1(b) and Count Five charge Richard Biaggi with aiding and abetting the receipt

of a gratuity, the stock issued in his name to his father. Because aiding and abetting gratuity receiving is a lesser included offense of aiding and abetting bribe receiving, all the evidence is the same. The only difference is which substantive crime, if either, the jury finds Congressman Biaggi guilty of—bribe receiving or gratuity receiving.

### Act 1(d)/Count Six: Mail Fraud

Act 1(d) and Count Six charge the issuance of the stock as mail fraud. The evidence against Richard Biaggi is the same as that against Congressman Biaggi on this count and act. The only difference is that the evidence is that Congressman Biaggi actually devised the fraudulent scheme, whereas Richard Biaggi merely participated in it, either as an aider and abettor or a common schemer.

### Act 6/Count Thirteen: Mail Fraud

▮ Act 6 and Count Thirteen charge Richard Biaggi with mail fraud against the Department of Defense in executing the sham stock purchase agreements. The evidence against Congressman Biaggi applies to his son as well, except that Richard Biaggi's participation in the scheme took different forms. First, Richard Biaggi was at a meeting between Wedtech personnel and Squadron Ellenoff lawyers, among others, at the Helmsley Palace in the fall of 1983, at which the tax consequences of the stock purchase agreements were discussed, and there was also discussion of the question who exactly should sell to John Mariotta. Second, it was Richard Biaggi who actually executed one of the stock purchase agreements.

### RICHARD BIAGGI—COUNT TWO: RICO CONSPIRACY

▮ This court's separate *Geaney* finding with respect to Richard Biaggi provides enough evidence of his agreement to commit the two racketeering acts with which he is charged—Act 1, relating to the 5% stock issuance, and Act 6, relating to the sham stock purchase agreement—to survive a motion for judgment of acquittal. As noted in the *Geaney* finding, he countersigned a letter from Mario Moreno setting forth the terms of the stock issuance, and he signed the stock purchase agreement. Again as noted in the *Geaney* finding, these acts are admissible as admissions against Richard Biaggi, and constitute evidence of his agreement to participate in the alleged fraudulent schemes. As to his knowledge that the schemes were indeed fraudulent, there is testimony from Irwin Wolf that he attended the Spring 1983 meeting at which it was decided that Congressman Biaggi's stock should be issued in his son's name, and testimony from Mario Moreno that he attended the Fall 1983 Helmsley Palace meeting at which the tax consequences of the stock purchase agreement were discussed. Because both witnesses testified only to Richard Biaggi's presence at these meetings, and not to conversations of his, there is no *Geaney* problem in admitting this testimony. Both racketeering acts are pleaded as mail fraud, and enough evidence has already been introduced on each of the elements of that crime—the mailing, existence of a fraudulent scheme, and knowing participation—for a reasonable jury fairly to conclude beyond a reasonable doubt that Richard Biaggi committed mail fraud. Moreover, his presence at the meetings mentioned provides the element of knowledge of bribes and gratuities to his father that assures sufficient evidence against him to resist a motion for judgment of acquittal as to Acts 1(a) and 1(b), which charge him with aiding and abetting bribery and gratuity receiving.

### RICHARD BIAGGI—COUNT SIXTEEN: PERJURED INCOME TAX RETURN

▮ Count Sixteen charges Richard Biaggi with filing a false income tax return for the calendar year 1983. The return is in evidence. It appears to be signed, and carries the requisite declarations of being made under penalties of perjury. The Wedtech stock issued in Richard Biaggi's name is reported as miscellaneous income for services rendered, at $34,391. There are at least three grounds from which a jury could conclude that Richard Biaggi did

not believe this declaration to be true and correct.

First, on the Government's theory that Congressman Biaggi was the true owner of the Wedtech stock, Richard Biaggi is falsely reporting the stock as his: that is, he is overreporting his income.

Second, the testimony, especially from the B & E witnesses, was that Richard Biaggi did very little legal work for Wedtech. Hence, a jury could conclude that "services rendered" is a sham.

Third, it is arguable that not only is Richard Biaggi overreporting his income from the Wedtech stock, he is misreporting it. Several other witnesses, for example Lawrence Shorten, testified that for tax purposes they reported the stock at its book value, between $.34 and $.37. This gives roughly the right figure for Richard Biaggi, but there was testimony from Irwin Wolf that, relying on a Wedtech source he could no longer name, he determined that the *fair market value* was about $.30 per share. This would be another false statement if the fair market value was actually much higher, as is suggested by the facts about the capitalization of the company (about 4.5 million shares and $100 million), as well as testimony from Shorten that the "trading value" (presumably the fair market value) was something closer to $2 million. The court notes that there was testimony that the stock was publicly offered at $16; this, multiplied by Richard Biaggi's 112,500 shares, comes to $1.8 million.

Finally, the above provides sufficient evidence of willful conduct for the purposes of § 1001.

### RICHARD BIAGGI—COUNT SEVENTEEN: FALSE TAX RETURN

Count Seventeen charges Richard Biaggi with filing a false tax return for 1985. The return is in evidence. It appears to be signed by Richard Biaggi, and carries a declaration that it is made under penalties of perjury. As with Count Sixteen, on the Government's theory that Congressman Biaggi owned the Wedtech stock, Richard Biaggi's reporting of $380,457 in capital

gains income from the sale of Wedtech stock is a false statement: he has overreported his income. And again as with Count Sixteen, there is sufficient evidence of willful conduct. If Richard Biaggi knew that the stock was not his, he knew that he should not have reported the gains from its sale.

### RONALD BETSO—COUNT ONE: RICO

In Count One, Ronald Betso is charged with unlawfully, willfully, and knowingly conducting or participating in the conduct of Wedtech through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and (5). The first two of the five elements of this RICO charge have already been discussed. The last three elements are discussed below.

*Third Element: Association with the Enterprise*

The jury could find proof beyond a reasonable doubt of this element from testimony that Ronald Betso attended the 1985 inaugural events at Wedtech's expense and that he attended fundraising and social events also attended by officers of Wedtech. The Rolodex with Ronald Betso's social security number and the Stock Option Agreement in his name are further evidence of his association with Wedtech.

*Fourth Element: Engaging in a Pattern of Racketeering Activity by Committing, or Aiding and Abetting the Commission of, At Least Two Acts of Racketeering Activity*

*Act 9(a)/Count Twenty–Six*

Racketeering Act 9(a) and Count Twenty–Six charge Ronald Betso with aiding and abetting Peter Neglia's agreement to receive a stock option for 20,000 shares of Wedtech stock as a bribe. The evidence of this racketeering act and count as to Peter Neglia has already been discussed. The jury could find proof beyond a reasonable doubt that Ronald Betso aided and abetted Neglia in committing this racketeering act and count by considering the following evidence.

Several witnesses testified that Ronald Betso attended the inaugural events at Wedtech expense. Moreno testified that when Peter Neglia was told that there would be a problem putting stock options in his name, Neglia said he would find someone in whose name they could be put, and he later gave Moreno Ronald Betso's name. There was testimony that Ronald Betso was present at two additional events at which the stock options were discussed and that he discussed possible employment with Wedtech. The Rolodex with Betso's social security number, the Board Minutes approving the issuance of the options in his name, and the copy of the Stock Option Agreement in his name are also in evidence. In conjunction with the testimony just described, the jury would be entitled to infer that Wedtech would not have gone to the trouble to have the option prepared and voted without first obtaining Betso's consent and cooperation.

Therefore, Ronald Betso's motion for acquittal as to Count Twenty–Six is denied.

*Act 9(b)/Count Twenty–Seven*

Racketeering Act 9(b) and Count Twenty–Seven charge Ronald Betso with aiding and abetting Peter Neglia's agreement to receive a stock option for 20,000 shares of Wedtech stock as a gratuity.

The evidence that would permit the jury to find proof beyond a reasonable doubt that Ronald Betso aided and abetted Peter Neglia's commission of Act 9(a) and Count Twenty–Six would also permit the jury to find proof beyond a reasonable doubt that Ronald Betso aided and abetted Peter Neglia's commission of Act 9(b) and Count Twenty–Seven.

Therefore, Ronald Betso's motion for acquittal as to Count Twenty–Seven is denied.

*Act 18/Count Forty–Nine*

 Racketeering Act 18 and Count Forty–Nine charge Ronald Betso with obstructing justice by making false statements on February 2, 1987 to a Special Agent with the Department of Labor Office of Labor Racketeering. From the following evidence, the jury would be entitled to find proof beyond a reasonable doubt

that Ronald Betso committed this racketeering act and count.

Special Agent Cossu testified that he and an associate interviewed Ronald Betso on February 2, 1987. Cossu said that he told Betso at the beginning that Cossu was participating in a Grand Jury investigation concerning allegations that Betso was involved with Wedtech. Cossu testified that Betso told him that Betso had had no conversations with either Peter or Joseph Neglia regarding stock options and that no one ever asked him to serve as a nominee for a stock option. These statements directly contradict the evidence presented by the Government. Cossu also testified that Betso turned up music that was playing in the room before the interview began, that Betso showed concern when Cossu handed Betso a Grand Jury subpoena, and that Betso asked Cossu if the conversation had been taped. The court finds that these actions show guilty knowledge. Therefore, the court denies Betso's motion for acquittal as to Count Forty–Nine.

As to the fourth element of Count One, there is sufficient evidence for the jury to find beyond a reasonable doubt that Ronald Betso committed, or aided and abetted the commission of, two racketeering acts. The court notes that although two unlawful acts do not necessarily form a pattern of racketeering activity, there is authority in this circuit for finding a pattern even when one of the two charged predicate acts alleges obstruction of justice. In *United States v. Teitler*, 802 F.2d 606, 616 (2d Cir.1986), the Second Circuit noted that one of the defendants in the case below had been convicted of participating in a RICO enterprise on the basis of her commission of only two predicate racketeering acts, one of which involved grand jury obstruction. In the context of deciding another issue, the Court commented that an act of obstruction (that occurred after the unlawful activities of the enterprise had concluded) could be considered part of the activities of the enterprise. This court finds that *Teitler* requires that the question of the existence of a pattern be sent to the jury in the present case. The jury would be entitled to

find on the basis of Betso's experience in political affairs and his attendance, with Neglia, at events hosted by Wedtech that Betso committed the two charged racketeering acts knowing that they were part of Wedtech's ongoing illegal activity, and in furtherance of its affairs, and that he therefore engaged in a pattern of racketeering activity through these acts. Therefore, the jury may find beyond a reasonable doubt that the fourth element of the RICO charge has been established.

*Fifth Element: Conducting or Participating in the Conduct of the Affairs of the Enterprise Through that Pattern of Racketeering Activity*

The evidence already described in connection with the fourth element of Count One also provides a sufficient basis for a jury to find beyond a reasonable doubt that as a result of Ronald Betso's friendship with Peter Neglia and his acquaintance with the Wedtech officers, defendant Ronald Betso participated, directly and indirectly, in the affairs of Wedtech. Therefore, Ronald Betso's motion for acquittal as to Count One is denied.

### RONALD BETSO—COUNT TWO: RICO CONSPIRACY

 The first three elements of Count Two have already been addressed in discussing Count One. As this court has already indicated, there is enough evidence for the jury to find these three elements proved beyond a reasonable doubt.

The fourth element of RICO conspiracy is the unlawful, knowing, willful agreement to commit at least two racketeering acts as listed in Count One through a pattern of racketeering activity. The evidence already discussed with respect to Count One that Ronald Betso actually participated in the conduct of Wedtech's affairs by committing Racketeering Acts 9 and 18 as part of a pattern of racketeering activity, in conjunction with the inferences discussed by this court in its *Geaney* finding, are sufficient for a jury to find beyond a reasonable doubt that Betso agreed to participate in the conduct of Wedtech's affairs through a pattern of racketeering activity.

Because the evidence is sufficient for a jury to find proof beyond a reasonable doubt of each element of Count Two, Ronald Betso's motion for acquittal as to this count is denied.